UNITED STATES DISTRICT COURT

for the

Northern District of Texas

Fort Worth Division

|  | | Case No. _____ |
|---|---|---|
| DAVID A. FOLEY | ) | |
| _Plaintiff_ | ) | |
| **-v-** | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| JOSEPH R. BIDEN, JR. | ) | |
| In his official capacity as President | ) | |
| of the United States only | ) | |
| _Defendant_ | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FROM PRESIDENTIAL EXECUTIVE ORDER NO. 14043

1.      The parties to this case are Plaintiff David A. Foley, an employee of the Federal Government's Executive Branch in his capacity as a private citizen domiciled in Tarrant County Texas, and Defendant President Joseph R. Biden, Jr., in his official capacity as President of the United States.  Jurisdiction over this action is conferred upon United States District Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiffs seek a declaratory judgment and injunctive relief pursuant to 28 U.S.C. § 2201. This case is properly before the United States District Court for the Northern District of Texas.

2.     Plaintiff, David A. Foley, an employee of the Federal Government, who holds the position of Regional Attorney with the National Labor Relations Board at its Sixteenth Regional Office has standing to file this petition, the Court has jurisdiction, and Plaintiff is likely to prevail in legal challenges to the Order.

3.     Plaintiff petitions the Court for declaratory and injunctive relief from "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*," Presidential Executive Order No. 14043, issued on September 9, 2021, by President Joseph R. Biden Jr., (the Order)[1], which mandates that Plaintiff face employment termination if he refuses an unwanted mRNA injection by October 11, or October 18, 2021.

4.     Specifically, Plaintiff seeks  (A) an order ruling the Order null and avoid[2], or, in the alternative, (B) an order enjoining Defendant from compelling Plaintiff to speak in support of the Order or otherwise compelling Plaintiff to materially cooperate in enforcement of the Order against other Federal employees, and/or (C) an order enjoining implementation of the Order until such time as Defendant has (i) provided all available information to support available exceptions, (ii) set forth a procedure for processing requests for exceptions, and (iii) processed all exception requests to the level of a final agency determination.

5.     To understand the myriad problems with the Order, it is first necessary to reflect briefly on the history of vaccination and "vaccine" mandates beginning with smallpox, an ancient virus capable of killing 30% of those infected.[3] Variolation, a precursor to vaccination was practiced as early as 1721. A safer and more effective method for preventing infections – vaccination -- was developed in 1796. The smallpox vaccine was first used in the United States in 1799.

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/09/09/executive-order-on-requiring-coronavirus-disease-2019-vaccination-for-federal-employees/
[2] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)("A Law repugnant to the Constitution is void.")
[3] https://www.cdc.gov/smallpox/history/history.html

6.     After experiencing the deadly scourge of smallpox for centuries and benefiting from a decade of smallpox vaccine use in humans, in 1809, the Commonwealth of Massachusetts passed a law which empowered local governments to mandate the smallpox vaccine in response to local outbreaks. One hundred years later, the Supreme Court of the United States upheld[4] the right of the Commonwealth legislature to narrowly tailor vaccine mandates targeted at localized outbreaks.

7.     Defendant's Executive Order 14043 attempts to bootstrap the legislative and judicial history of conventional vaccines, like the smallpox vaccine, onto mRNA therapies. The marketers of these treatments have done well to attach the word "vaccine" to these products since mRNA injections might be more accurately described as "mRNA gene therapy.[5]" Indeed, mRNA injections have much more in common with the latter, and those who would impose them onto the public should not profit by exploiting the storied history and legal holdings pertinent to the former.

8.     The Centers for Disease Control (CDC) describes the novel mRNA injection process as a "new type of vaccine." It goes on to explain that, while traditional vaccines "put a weakened or inactivated germ into our bodies," mRNA injections "teach" the cells of our bodies "how to make a protein – or even just a piece of a protein – which purportedly triggers an antibody-producing immune response, and [that] protect us from getting infected if the real virus enters our bodies[6]."

---

[4] See *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), a ruling that has was implicitly limited by the subsequent disavowals of its infamous progeny, *Buck v. Bell,* 274 U.S. 200 (1927) ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind.").

[5] See "CDC Changes the Definition of Vaccines," Dr. Joseph Mercola, September 26, 2021, available at https://articles.mercola.com/sites/articles/archive/2021/09/25/cdc-changes-the-definition-of-vaccines.aspx (last visited September 26, 2021)

[6] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mrna.html (last visited September 26, 20210)

9.      Although the CDC represents that mRNA injections are safe and effective, many Americans are unconvinced, and, as discussed infra, with good reason. Some 60,000,000 Americans prefer the role of control group during what would have heretofore been considered an early stage in the development cycle of a new vaccine.

10.     Tellingly, no state legislature has passed a law requiring mRNA injections. To the contrary, where legislative bodies have acted, they have acted to restrict injection mandates.[7] Including executive actions by governors, 12 states thus far, including Texas (the situs of the dispute), have taken actions that limit government or corporate authority to mandate injections[8].

11.     Given that the mRNA injections are controversial medical interventions and not traditional vaccines, and given that the mandate involves the administration of unwanted, emergency use only[9] medical treatment upon Federal employees, or else deprives them of a property interest, the Order should be reviewed under the standard of strict scrutiny, under which the Defendant must establish a compelling state interest and a narrowly tailored policy.

---

[7] See https://www.beckershospitalreview.com/workforce/11-states-banning-covid-19-vaccine-mandates-how-it-affects-healthcare-workers.html (last visited on September 26, 2021)("Indiana: On April 29, Republican Gov. Eric Holcomb signed a law prohibiting state or local governments from requiring anyone, including employees, to show proof of vaccination… Montana: On May 7, Republican Gov. Greg Gianforte signed a bill that prohibits discrimination based on vaccination status… New Hampshire: On July 26, Republican Gov. Chris Sununu signed a bill stating that employers may only mandate immunization as a condition of employment when a "direct threat" exists…North Dakota: On May 7, Republican Gov. Doug Burgum signed a bill prohibiting state government entities from requiring a private business to obtain documentation to verify an individual's vaccination status… Tennessee: On May 25, Republican Gov. Bill Lee signed a bill that prohibits a state agency, department or political subdivision from mandating COVID-19 vaccines… Utah: On March 16, Republican Gov. Spencer Cox signed a bill that prohibits state agencies from requiring people to get a COVID-19 vaccine as a condition of employment.)
[8] Id.
[9] Although the FDA has approved Comirnaty, that injection has "certain differences" and is "legally distinct" from the widely available product that was mass-produced under an Emergency Use Authorization Pfizer injection product which is widely available. See https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine;The Food and Drug Administration, Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19) (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download; Pfizer, Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-releasedetail/pfizer-and-biontech-announce-collaboration-brazils; Press Release, Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf.

12.     Both the existence of a compelling state interest and the possibility of narrow tailoring are undermined by the recent admission of the producer of the only FDA approved mRNA injection, Pfizer, that the potency of its injection wanes so significantly by six to eight months, that a "booster shot" is required at that time[10]. Unfortunately for Defendant, principled members of an FDA Advisory Committee recently refused to authorize a booster shot for the majority of the population[11]. This means that most "fully vaccinated" individuals are gradually losing any claim to have higher immunity than their un-injected neighbors.

13.     With the booster shot yet unapproved for the general population, the Order now paradoxically goes into effect just as the protections of the mRNA injections for those who took them between March and May vanishes.

14.     Even more paradoxically, those who have recently survived COVID infections and whose bodies are protected by natural antibodies are subjected to the mandate.

15.     Given this paradoxical state of affairs, Defendant can neither establish a compelling interest in the mandate, nor that the mandate is narrowly tailored.

16.     Far from a narrowly tailored action based on a compelling state interest, the Order is the despotic and irrational action of a President whose "patience" with the citizens who make their

---

[10] See *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download ("Recent data from Israel and the United States…suggest that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months following the second dose…likely primarily due to waning effectiveness rather than due to Delta escaping vaccine protection")
[11] https://www.fda.gov/news-events/press-announcements/fda-authorizes-booster-dose-pfizer-biontech-covid-19-vaccine-certain-populations

own healthcare decisions "is wearing thin," in contravention of his political interest[12] in increasing vaccination rates.[13]

17.     Lacking any cogent rationale, the President summarily tossed aside established regulatory procedures that would have otherwise facilitated the tailoring of reasonable vaccination requirements to the risks of COVID-19 transmission unique to the Federal employment positions. Indeed, initially Defendant had ordered that Federal employees either undergo injections or else undergo regular testing[14]. But, before that order could be implemented, Defendant vacillated and ordered that all employees undergo injections unless they can establish "exceptions as required by law."

18.     The President issued the Order under the auspices of the "efficiency of [the] service" where his stated goal was to render the Federal workplace safer for employees and for members of the public who interface with those employees. But the actual goal is rote vaccination guideline compliance, a goal which has some overlap with the goal of safety improvement, but which remains distinct from it.

19.     Where the Order allows exceptions only if "required by law", it necessarily forecloses circumstances where exceptions would be *reasonable or rational* and bakes into the Order a rigid inflexibility on the part of Federal agencies to permit reasonable and rational exceptions to the mRNA-vaccine mandate. In so doing, it assures arbitrary applications. Thus, even under a "rational basis" standard of review, the Order fails because it demands arbitrary results.

---

[12] Defendant's goal was that 70% of the citizens would be vaccinated by July 4, 2021. See https://abcnews.go.com/Politics/white-house-concedes-us-hit-bidens-70-vaccination/story?id=78419718 (last checked September 28, 2021)

[13] See https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ ("We've been patient, but our patience is wearing thin.")

[14] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/29/remarks-by-president-biden-laying-out-the-next-steps-in-our-effort-to-get-more-americans-vaccinated-and-combat-the-spread-of-the-delta-variant/

20.     The Order creates an irrational and irrebuttable presumption[15] that mRNA-vaccinated employees are safer than their un-injected peers and it deprives a class of citizens of their equal protection under the law.  In so doing, Defendant's Executive Order 14043 deprives federal employees of vested interests in employment positions without providing them with due process, running afoul of the Fifth and Ninth Amendment protections available to Federal employees.

21.     The Order's "exceptions as required by law" appear to be limited to two circumstances: exceptions under Title VII of the Civil Rights Act of 1964 for those whose deeply-held religious beliefs compel them to reject the mRNA injections and exceptions under the Rehabilitations Act and or Americans with Disabilities Act for those whose disabilities prevent them from safely suffering the mRNA injections[16].

22.     Although we are currently within two weeks of the date employees must be injected with the Moderna product to stay on schedule (October 11, 2021) for "full vaccination," no further guidance on exceptions or the process for granting them has been provided.  If, as it appears, these are the only available exceptions, arbitrary results must follow.

23.     An employee who is at high risk for suffering severe side effects from the injections and low risk of severe outcome from a SARS-CoV-2 infection has no recourse unless he can prove that his risk is associated with a disability; this is arbitrary[17].

---

[15] See e.g. *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632 (1974)(irrational presumption that pregnant women would eventually become physical incapacitated for a certain period of time); *U.S. Dep't of Agriculture v. Murry*, 413 U.S. 508, 513-24 (holding that a determination of an individual's need for food stamps based on the income of that individual's non-minor children claimed as dependents created an irrebuttable presumption that was "not a rational measure of the need of the household")

[16] https://www.saferfederalworkforce.gov/faq/vaccinations (last visited September 26, 2021) ("Q: Are there exceptions to the requirement for all employees to be fully vaccinated? A…In particular, an agency may be required to provide a reasonable accommodation…because of a disability or because of a sincerely held religious belief, practice, or observance…Additional guidance on legally required exceptions will be forthcoming.")

[17] See *Pa. Dep't of Transp. v. Clayton*, 684 A.2d 1060, 1065 (Pa. 1996)( regulation which provided revocation of one's operating privilege for a period of one year upon the occurrence of only a single epileptic seizure, without the licensee having an opportunity to present medical evidence in an effort to establish his or her competency to drive, violates due process.)

24.     An employee who has recently defeated a COVID infection and who can establish high levels of protective antibodies would be discharged under the Order, while an employee who received injections nine months prior would remain employed, despite the fact that the "vaccinated" employee maintains little, if any, remaining protection from the injections; an arbitrary result.

25.     An employee who works exclusively via telework and has little to no interaction with the general public would be compelled to undergo an injection in the name of making the workplace safer and protecting the public; this is arbitrary, if not absurd.

26.     Likewise, despite the fact that the protective properties of the injections wane significantly by the sixth month[18] and are effectively rendered temporary, the Order rigidly provides for only the "permanent" solution of employment termination.

27.     If unvaccinated federal workers are a danger to their coworkers, such a hazard could be mitigated through changes to schedules such as telework or scheduling work for times when others are absent, or (in the worst case) through a temporary lay-off rather than a termination for insubordination. Recall from employee lay-off would be appropriate when injection durability wanes among the "vaccinated" population, or, when a variant spike during the pandemic has receded.[19]   The threat of permanent job loss for refusal to take an injection which is only

---

[18] See *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download ("Recent data from Israel and the United States…suggest that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months following the second dose…likely primarily due to waning effectiveness rather than due to Delta escaping vaccine protection")
[19] See for instance the Russian treatment of its public employees. https://www.loc.gov/item/global-legal-monitor/2021-06-22/russian-federation-unvaccinated-employees-can-be-suspended-without-pay/(" the minister of labor of the Russian Federation stated that while the Labor Code does not allow termination of employment for those who refuse to get the vaccine, unvaccinated employees can be suspended from work without pay if mandatory vaccination has been declared in the region by the region's chief doctor of sanitation").

temporary in nature is arbitrary and strongly suggests that the entire purpose of the Defendant's Order is to coerce injection compliance rather than improve workplace safety.

28.      *If* the Order was ever a reasonable and constitutional extension of the Defendant's executive branch authority, the recent and unexpected rejection of the third dose "booster shot" by the FDA for anyone other than at-risk elderly populations[20] has rendered its continued enforcement arbitrary and capricious.

29.      While the Order recognizes that the law might interfere with Defendant's ability to force certain Federal employees to receive the injections, the Order fails to provide exceptions for those whose consciences prevent them from providing material support to the President in encouraging and punishing other employees to achieve compliance. In this regard, the Order compels speech in violation of the First Amendment.

## IRREPARABLE HARM

30.      As discussed in further detail, infra, Presidential Executive Order No. 14043, issued on September 9, 2021, by Joseph R. Biden Jr., "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*" (the Order), is unconstitutional on numerous grounds.

31.      The President has demonstrated a willingness to take knowingly unconstitutional executive action in order to achieve his purposes in the time between his orders and eventual court rulings— time is on his side[21].

---

[20] See 6:56 of FDA Advisory Committee Sep 17, 2021 on Application of Pfizer for a "booster" shot (https://youtu.be/WFph7-6t34M) (last visited September 26, 2021).

[21] See e.g. https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/03/remarks-by-president-biden-on-fighting-the-covid-19-pandemic/ ("Well, look, the courts made it clear that the existing moratorium was not constitutional; it wouldn't stand... I've sought out constitutional scholars to determine what is the best possibility that would come from executive action, or the CDC's judgment, what could they do that was most likely to pass muster, constitutionally. The bulk of the constitutional scholarship says that it's not likely to pass constitutional muster… Whether that option will pass constitutional measure with this administration, I can't tell you. There are a few scholars who say it will and others who say it's not likely to. But, at a minimum, by the time it gets litigated, it

32.     Plaintiff will likely succeed in his challenges to the Order, but the remedies available at the conclusion of such challenges, absent injunctive and declaratory relief, will be insufficient to undo the damages caused by certain harms that are likely to befall the Plaintiff, as an affected employee of the Federal Government and as a member of the public that is served by affected Federal employees.

33.     The likely harm faced by Plaintiff depends on the decisions he must soon make in this Hobson's choice of either acceding to the President's demands that he suffer a novel injection or face discharge for refusing to do so.

34.      Should Plaintiff succumb to the pressure of the threatened job loss, at a minimum, he will have received an invasive medical treatment that is contrary to his conscience and desires.

35.     Furthermore, Plaintiff will likely suffer the known and established (if downplayed) side effects associated with the mandated injections, which include pain, redness, and swelling at the injection site, as well as fatigue, headache, muscle pain, chills, fever, and nausea[22].  Absent injunctive and declaratory relief, no final order after protracted litigation will prevent Plaintiff from experiencing known injection-induced maladies that were otherwise avoidable absent the President's vaccine mandate at bar.

---

will probably give some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money.  That's why it was passed in — in the act that we passed in the beginning of my administration, and it went to the states.")

[22] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html (last visit September 26, 2021).

36.     Furthermore, Plaintiff may suffer more severe documented side effects[23] such as anaphylaxis[24], myocarditis[25], pericarditis, Bell's palsy[26], other disabling illnesses[27], miscarriage[28], infertility, and death[29]. Absent injunctive and declaratory relief, no order granted after protracted litigation can restore cardiac function, prevent lost earnings, bear offspring from damaged reproductive organs, or resurrect dead employees.

37.     Plaintiff might furthermore suffer from unknown side effects if coerced into undergoing a series of undesired and unneeded novel mRNA injections[30].

38.     Should Plaintiff not allow President Biden to dictate his personal medical decisions, he will face a different slate of irreparable harms depending on whether he attempts to prove an exception or refuses the injections outright without claiming a disability or religious exemption.

39.     Should he refuse the Government-mandated injections and choose not to apply for an exception, Plaintiff faces the certain prospect of termination- "the capital punishment of the workplace."  Absent injunctive relief, a prolonged legal challenge may pave the road to backpay and reinstatement, but backpay and return to the same position previously held will not remedy

---

[23] As of September 17, 2021, 66,642 unverified claims of side effects requiring hospitalization, 82,645 requiring urgent care visits, and 114,127 had been reported on the on the Vaccine Adverse Event Reporting System (VAERS). https://openvaers.com/covid-data/hospitalizations; https://openvaers.com/covid-data/urgent-care; https://openvaers.com/covid-data/office-visits

[24] As of September 17, 2021, 6,378 unverified claims of anaphylaxis caused by the injections had been reported on VAERS  https://openvaers.com/covid-data/anaphylaxis

[25] As of September 17, 2021, 6,812 unverified claims of myocarditis or pericarditis caused by the injections had been reported on VAERS  https://openvaers.com/covid-data/cardiac#myocarditis

[26] As of September 17, 2021, the 8,326 unverified claims of Bell's palsy caused by the injections had been reported on VAERS https://openvaers.com/covid-data/bellspalsy

[27] As of September 17, 2021, the 20,789 unverified claims of permanent disability caused by the injections had been reported on VAERS https://openvaers.com/covid-data

[28] As of September 17, 2021, the 8,326 unverified claims of miscarriage caused by the injections had been reported on VAERS https://openvaers.com/covid-data/reproductive-health

[29] As of September 17, 2021, the 15,386 unverified claims of death caused by the injections had been reported on the VAERS https://openvaers.com/covid-data/mortality

[30] See Roxana Bruno, Peter A Mccullough, Teresa Forcades I Vila, et al. *SARS-CoV-2 mass vaccination: Urgent questions on vaccine safety that demand answers from international health agencies, regulatory authorities, governments and vaccine developers*; Authorea. May 24, 2021. *https://www.authorea.com/doi/full/10.22541/au.162136772.22862058*

the economic harm suffered while traveling down that road, including the possibility of defaulting on debts and mortgages, damaged credit, loss of insurance, inability to pay medical bills, and potential home loss.

40.     Absent injunctive and/or declaratory relief, protracted litigation cannot restore loss of experience suffered through job loss with the Federal Government. Most career paths within the Federal Government, including the Plaintiff's career path, are entirely reliant upon internal experience. In Plaintiff's case, the next rung on his career ladder would be Regional Director, a position for which he will be unable to gain relevant experience outside of the Federal Government. Absent injunctive and/or declaratory relief, the complete loss of career experience between his termination and reinstatement cannot be restored.

41.     One of the key recruitment incentives that the Federal Government offers its employees is the promise of job stability. For a citizen who sought out a stable position, the looming threat of the discharge unrelated to job performance is already placing a toll on Plaintiff, and discharge will only cause further emotional turmoil and distress.  Being injected with a series of novel and hastily created injections has never been a condition of Plaintiff's employment in his twelve years of service to the Federal Government. Absent injunctive and/or declaratory relief, a final Order after protracted litigation cannot remedy snowballing turmoil and distress associated with termination and loss of livelihood by refusing novel medical interventions that have suddenly been mandated by President Biden as a condition of Federal employment.

42.     Should Plaintiff seek an exception to the mandate, he will be subjected to all the harms above if his exception request fails. Likewise, by now being compelled by the President's mandate to submit medical and religious exception requests under duress (threat of job loss), Plaintiff will face the irreparable harm of being likewise compelled to reveal otherwise private-

until-now information to his employer, including, but not limited to, personal medical

history, family medical history, genetic composition, religious beliefs, and political beliefs. Such

private information will be further exposed to the general public if exceptions are denied,

because Plaintiff would then be compelled to divulge this information while seeking judicial

recourse.

43.      Plaintiff is part of a movement of employees within the Federal Government who are

opposed to injections and/or injection mandates for scientific and moral reasons. These

employees work across many agencies, including at regulatory agencies like the FDC and the

CDC. If Plaintiff is discharged now, it will be too late for him to have a voice in ongoing policy

determinations by the time he is offered reinstatement.

44.      In addition to suffering irreparable harm with respect to the above, Plaintiff whose

responsibilities include labor relations and management of roughly 25 employees will be harmed

by the Order because he will inevitably be tasked with encouraging/compelling subordinates to

undergo injections, and he will inevitably be tasked with facilitating the discipline and discharge

of those who refuse. Plaintiff should not be compelled to make statements about novel medical

interventions to which he objects. Nothing other than swift injunctive relief could mitigate such

irreparable harm.

45.      The public that is served by Federal employees, including Plaintiff who is likewise a

member of the public, will also suffer harm from a Federal workforce that has been

systematically stripped of employees who dissent from the majoritarian "consensus" regarding

the utility of novel medical injections. As President Biden wrote in an earlier executive

order, "the Federal Government is at its best when drawing upon all parts of society, our greatest

accomplishments are achieved when diverse perspectives are brought to bear to overcome our greatest challenges.[31]"

46.     The cleansing of viewpoint diversity from the ranks of the Federal government will irreparably harm the public, including Plaintiff.  Should institutions such as the Centers for Disease Control and Prevention ("CDC"), the Food and Drug Administration ("FDA"), the Merit Systems Protection Board ("MSPB"), and the Department of Justice ("DoJ"), be cleansed of those who dissent on this important question of our day, these agencies no longer draw from "diverse perspective," and the 62 million Americans, including Plaintiff, who choose not to receive this medical intervention will no longer find advocates within the Federal bureaucracy. Absent injunctive and/or declaratory relief, a final judgment entered after protracted litigation cannot possibly remedy the harm faced by the public in the interim period. Such irreparable harm is not limited to the public in general, but rather has a high likelihood of harming Plaintiff in a predictable manner.

47.     Assuming Plaintiff is discharged, he will contest his discharge at the "quasi-judicial" forum of either the Merit Systems Protection Board[32] or the Equal Employment Opportunity Commission (EEOC)[33]. At that time, the MSPB and the EEOC that will have been cleansed of like-minded or otherwise free-thinking advocates who oppose President Biden's mRNA injection mandate. Moreover, Plaintiff can expect that other similarly cleansed agencies such as the CDC and FDA will provide Defendant with "scientific authority" to defend his case of unlawful discharge that are even more biased, arbitrary, and capricious than what is currently promulgated. Thus, Plaintiff can neither expect viewpoint diversity nor a fair shake when the

---

[31] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/25/executive-order-on-diversity-equity-inclusion-and-accessibility-in-the-federal-workforce/
[32] https://www.federalregister.gov/agencies/merit-systems-protection-board (describing the MSPB)
[33] See discussion of EEO processes pages 5-6 of https://rrb.gov/sites/default/files/2017-05/ineffi.pdf

injection-as-condition-of-employment has deprived him of institutional allies throughout all agencies of the Executive Branch.

**FACTS**

48.     By the spring of 2020, the novel coronavirus SARS-CoV-2, which causes COVID-19 infections, enveloped the globe. COVID-19, via its myriad variants continues to infect significant portions of the populations of Texas and the Unites States. Institutions took various steps to combat the spread of COVID-19, including investment in the development of preventative treatments.

49.     Risk factors for severe illness from COVID-19 include older age, male gender, in addition to age and gender independent comorbidities such as diabetes mellitus, cardiovascular disease, hypertension, chronic kidney disease, cancer, obesity, and smoking[34]. Furthermore, the severity of COVID-19 infections has a genetic component. Id.

50.     Conventional vaccines prevent many millions of illnesses and save numerous lives every year. As a result of the widespread acceptance of childhood inoculation, the smallpox virus has been completely eradicated and the prevalence of polio, measles and other childhood onset diseases has been drastically reduced around the world. Conventional vaccines are derived through the use of live attenuated and inactivated pathogens and provide relatively durable protection against a variety of dangerous diseases.

51.     The "vaccines" developed in response to COVID-19 are described as "mRNA Vaccines," which differ substantially from conventional vaccines. As reported by the Miami Herald on

---

[34]*An immunogenetic view of COVID-19* Genet Mol Biol. 2021; 44(1 Suppl 1): e20210036; Published online 2021 Aug 25. doi: 10.1590/1678-4685-GMB-2021-0036, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8388242/ (last visited September 26, 2021)

September 9, 2021, the CDC recently changed the definition of "vaccine" seemingly to obfuscate the distinction between traditional vaccines and mRNA injections:

> "Before the change, the definition for 'vaccination' read, 'the act of introducing a vaccine into the body to produce immunity to a specific disease.' Now, the word "immunity" has been switched to 'protection.'
>
> The term 'vaccine' also got a makeover. The CDC's definition changed from 'a product that stimulates a person's immune system to produce immunity to a specific disease' to the current 'a preparation that is used to stimulate the body's immune response against diseases.'"

52.     Incidentally, by the CDC's new definition, potential therapies such as an Ivermectin regimen, or even a lozenge containing the mineral Zinc, could be defined as "vaccines" because they stimulate immune response against diseases[35]. But the President has no more right to coerce Federal employees into taking "off-label" medications or vitamins than he does to make them (under threat of employment loss) eat their vegetables[36], exercise, or consume only moderate servings of sugar, even though these measures would surely assist in combatting COVID-19 and obesity, among many other potential health crises.

53.     Recent definitional changes and the "evolving" understanding of what constitutes a "vaccine," should not – like recent changes in the definition of "marriage" or "sex" – be retrofitted into caselaw. It remains factually and legally important to distinguish between those

---

[35] https://www.mayoclinic.org/drugs-supplements-zinc/art-20366112 (last reviewed September 28, 2021)

[36] The concept of an individual's right to maintain the sovereignty of what he puts into his body is an ancient one and is still recognized today.  See e.g., Daniel 1:8-16 "But Daniel was resolved not to defile himself with the king's food or wine; so he begged the chief chamberlain to spare him this defilement."; *Dowdy-El v. Caruso,* No. 06-11765, 2013 WL 6094695 (E.D. Mich. Nov. 20, 2013)(requiring the provision of Kosher food for Muslim inmates); *Commissioner v. Coleman,* Conn: Supreme Court 2012 ("'[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'") *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990)("the 'notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment'" and "'[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.")

cases where "vaccines" have been required and those where mRNA therapies have been required.

54.     To hasten the production of preventative treatments, President Trump ordered "Operation Warp Speed," resulting in three separate coronavirus mRNA "vaccines" that have been developed, approved, and circulated among the human population more swiftly than any other vaccine in our nation's history. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine ("Pfizer mRNA Vaccine") on December 11, 2020.  Just one week later, the FDA issued a second EUA for the Moderna COVID-19 Vaccine ("Moderna mRNA Vaccine"). On August 23, 2021, the FDA approved the Pfizer mRNA Vaccine under the brand name, "Comirnaty."[37] However, the product that the FDA approved – "Comirnaty" – is not widely available. The "similar" – not chemically identical – product, which was distributed subject to EUA, is being distributed "interchangeably.[38]"

55.     The protections offered by the mRNA "vaccines" are not absolute as they range anywhere from 67% to 96% effective at mitigating severe COVID-19 infections at the time protection takes hold – typically two weeks after the second injection. It is well documented that "fully vaccinated" individuals can contract and spread the COVID-19 virus[39]. Indeed, the CDC

---

[37] https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.
[38] Although the FDA has approved Comirnaty, that injection has "certain differences" and is "legally distinct" from the widely available product that was mass-produced under an Emergency Use Authorization Pfizer injection product which is widely available. See https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine;The Food and Drug Administration, Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19) (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download; Pfizer, Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-releasedetail/pfizer-and-biontech-announce-collaboration-brazils; Press Release, Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf.
[39] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last reviewed September 28, 2021)

openly admits that there is insufficient data as to whether the "vaccinated" transmit COVID-19 any less than the "unvaccinated" with respect to the current Delta variant of SARS-CoV-2.[40]

56.      Whatever protections the mRNA "vaccines" provide at first degrade over time.  The duration of such protection is currently unknown. However, according to Pfizer, recent research suggests "that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months following the second dose."[41] For that reason, Pfizer sought FDA approval for a 3rd booster shot. On September 19, 2021, the FDA Advisory Board voted to deny approval of the 3rd booster shot for anyone other than those over the age of 65, or those over age 50 with high-risk comorbidities. CDC Director Rochelle Walensky, in a rare flex of administrative authority, unilaterally overruled the advisory board to extend booster shot availability to those who work in high-risk professions, as well as those aged 18-48 who possess high-risk comorbidities.[42]

57.      By May 22, 2021, one-third of the US adult population was considered "fully vaccinated." There is little evidence suggesting that these "fully vaccinated" people will maintain lasting mRNA injection protection by November 22, 2021 – President Biden's deadline for Federal employees to achieve "fully vaccinated" status[43].

58.      For the vast majority of the population, natural immunity is sufficient to defeat the COVID-19 virus without suffering severe infection. In general, the younger and healthier the

---

[40] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.

[41] *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download

[42] https://www.cnbc.com/2021/09/23/covid-booster-shots-cdc-panel-endorses-third-pfizer-doses-for-millions.html.

[43] https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna ("How long will Comirnaty provide protection? Data are not yet available to inform about the duration of protection that the vaccine will provide.")

individual, significantly less likely is the case that such an individual will contract a COVID-19 infection resulting in serious illness.[44]

59.     People who have contracted and defeated COVID-19 develop antibodies to the virus. Natural antibodies are at least as effective at mitigating COVID-19 infections as are "vaccine" derived antibodies. *Id.* A person's levels of natural antibodies can be detected through antibody testing. Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust, durable, and long-lasting as that achieved through vaccination.[45]

60.     In recognition of the highly protective character of natural immunity, the European Union has recognized "a record of previous infection" as a substitute for any vaccine passport requirements. Even France's controversial new restrictive mandate on the ability to participate in daily life focuses on a person's immunity rather than their vaccine status—treating natural immunity and vaccine immunity equally.[46]

61.     Similarly, the United States requires everyone, including its citizens, to provide proof of a negative COVID-19 test before returning to the country from abroad. Documentation of recovery suffices as a substitute, although proof of vaccination does not.[47]

---

[44] *America's Frontline Doctors White Paper On Experimental Vaccines For COVID-19*, June 1, 2021, available at https://americasfrontlinedoctors.org/files/americas-frontline-doctors-white-paper-on-experimental-vaccines-for-covid-19/ (last visited September 26, 2021).

[45] Nabin K. Shrestha, et al., Necessity of COVID-19 Vaccination In Previously Infected Individuals, MEDRXIV (June 5th, 2021), available at https://bit.ly/2TFBGcA (last visited Aug. 1, 2021); see also Yair Goldberg, et al., Protection of Previous SARS-Cov-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel, MEDRXIV (Apr. 20, 2021), available at https://bit.ly/3zMV2fb (last visited Aug. 1, 2021); Smerconish, Should Covid Survivors and the Vaccinated Be Treated the Same?: CNN Interview with Jay Bhattacharya, Professor of Medicine at Stanford University (June 12, 2021), available at https://cnn.it/2WDurDn (last visited Aug. 1, 2021); Marty Makary, The Power of Natural Immunity, WALL STREET JOURNAL (June 8, 2021), available at https://on.wsj.com/3yeu1Rx (last visited Aug. 1, 2021). Indeed, the CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people. Where's the data?, WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited July 30, 2021).

[46] See, e.g., Clea Callcutt, France forced to soften rules after coronavirus green pass backlash, POLITICO (July 20, 2021), available at https://politi.co/3f9AZzS (last visited July 29, 2021).

[47] See Requirement of Proof of Negative COVID-19 Test or Recovery from COVID-19 for All Air Passengers Arriving in the United States, CDC (July 6, 2021), available at https://bit.ly/3yfcJDM (last visited July 28, 2021).

62.     The EUA statute, *21 U.S.C. § 360bbb-3*, explicitly provides that anyone to whom an EUA product is administered must be presented the option to accept or to refuse it, as well as to be afforded informed consent as to the risks and benefits of receiving the product and potential alternatives to the product.

63.     It is uncontroverted that near-term side effects of the Pfizer-BioNTech COVID-19 Vaccine include pain, redness, and swelling at the injection site, as well as tiredness, headache, muscle pain, chills, fever, nausea.[48]

64.     Other documented near term side effects include myocarditis, pericarditis, blood clots, and death.[49]

65.     Serious concerns have been raised about the safety of taking the shots while pregnant or attempting to conceive.[50]

66.     The full extent of near-term side effects is still uncertain, and the risk of long-term side effects is almost entirely unknowable.[51]

67.     Roughly 62 million adults Americans have chosen not to receive an injection. It is well documented that these vaccine-dissenters are disproportionately comprised of "white

---

[48] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html#:~:text=Some%20people%20have%20no%20side,of%20receiving%20a%20vaccine%20dose.

[49] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html (Men under 40 years old seem to be at the highest risk for this outcome, see FDA Committee discussion at 6:28-6:30. https://www.youtube.com/watch?v=WFph7-6t34M&t=23379s. See also June 11, 2021, report by CDC) blood clots and death (5,439 reported as of September 19, 2021).

[50] https://abc13.com/pregnant-women-and-covid19-should-get-vaccine-moderna-world-health-organization-data/10051361/

[51] See "More Dangerous Side Effects Potentially Linked To mRNA Vaccines, EU Warns," Tyler Durden, August 11, 2021 https://www.zerohedge.com/covid-19/new-side-effects-potentially-linked-mrna-vaccines-eu-warns (last site visit September 24, 2021)

Republicans and white Evangelicals"[52] a group that happens to represent the core of political opposition to President Biden.

68.     Americans who object to the novel mRNA injections have become the favorite scapegoat of the media and Biden administration for all ongoing COVID-19-related problems, despite the fact that nations like Israel with much higher mRNA-vaccination rates continue to have their own recent spikes in COVID-19 case, hospitalizations, and deaths.[53]

69.     Americans who object to the novel mRNA injections are being systematically shut out of social and economic life as restrictions have been place on their ability to visit restaurants or entertainment venues, their ability to work and hold professional licenses[54], and their ability to speak out again the novel mRNA injections on social media[55].

70.     In announcing his mandate on September 9, 2021, President Biden proclaimed, "[w]e have been patient, but our patience is wearing thin, and your refusal has cost all of us. The unvaccinated minority can cause a lot of damage, and they are.[56]"

71.     Speaking for the President on the following day, Cedric Richmond, director of the White House Office of Public Engagement, addressed those who object to undergoing the novel mRNA injection, claiming that it is:

> "unfortunate that we have so many governors that are using vaccinations and mask requirements as a political gain. But our purpose is to save lives, and we will do anything and everything under our control to make sure that we protect our citizens, especially

[52] See "Why Some White Evangelical Republicans Are So Opposed To The COVID-19 Vaccine," Natalie Jackson, August 26, 2021 https://fivethirtyeight.com/features/why-some-white-evangelical-republicans-are-so-opposed-to-the-covid-19-vaccine/ (last site visit September 24, 2021).
[53] *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download
[54] See e.g. https://www.healthleadersmedia.com/clinical-care/physicians-face-disciplinary-action-coronavirus-vaccine-misinformation (last checked September 28, 20210)
[55] https://www.wsj.com/articles/biden-blasts-covid-19-vaccine-misinformation-on-social-media-11626464163 (noting that Facebook has removed millions of posts and deplatformed an untold number of users for posting facts contrary to the accepted narrative)
[56] See https://www.dallasnews.com/news/2021/09/10/some-north-texans-see-tyranny-in-bidens-vaccine-mandate-others-say-it-affirms-belief-in-shots/ (last visit September 26, 2021)

those children who cannot get a vaccination yet. And so, we have to do everything we can to make sure adults do it. And those governors that stand in the way, I think it was very clear from the president's tone today that he will run over them."[57]

72.   On July 29, 2021, President Biden issued a public statement in which he proclaimed that, "every federal government employee will be asked to attest to their vaccination status." The President went on to state that employees who do "not attest or [are] not vaccinated will be required to mask no matter where they work; test one or two times a week to see if they have a — they have acquired COVID; socially distance; and generally will not be allowed to travel for work."[58]

73.   On September 9, 2021, President Biden., invoking the authority vested in him "as President by the Constitution [generally] and the laws of the United States of America, including sections 3301[59], 3302[60], and 7301[61] of title 5, United States Code" issued Executive Order No. 14043, "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*." (the Order)

74.   In the Order, President Biden stated that it was his policy to "halt the spread of coronavirus disease 2019 (COVID-19), including the B.1.617.2 (Delta) variant, by relying on the best available data and science-based public health measures," and that the CDC "has determined

---

[57] See "Shots fired: Biden adviser vows Joe will 'run over' govs opposed to vax mandate," Samuel Chamberlain, New York Post, September 10, 2021 https://nypost.com/2021/09/10/adviser-vows-biden-will-run-over-govs-opposed-to-vaccine-mandate/ (last visited September 24, 2021)
[58] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/29/remarks-by-president-biden-laying-out-the-next-steps-in-our-effort-to-get-more-americans-vaccinated-and-combat-the-spread-of-the-delta-variant/
[59] The President may—(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service; (2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and
(3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.
[60] The President may prescribe rules governing the competitive service. The rules shall provide, as nearly as conditions of good administration warrant, for—(1) necessary exceptions of positions from the competitive service; and (2) necessary exceptions from the provisions of sections 2951, 3304(a), 3321, 7202, and 7203 of this title.
Each officer and individual employed in an agency to which the rules apply shall aid in carrying out the rules.
[61] The President may prescribe regulations for the conduct of employees in the executive branch.

that the best way to slow the spread of COVID-19 and to prevent infection by the Delta variant or other variants is to be vaccinated." The President stated that, "[i]t is essential that Federal employees take all available steps to protect themselves and avoid spreading COVID-19 to their co-workers and members of the public," and so he found that "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law." He ordered each agency to take steps towards ensuring universal vaccination (except as required by law) and directed the Safer Federal Workforce Task Force ("Task Force") to issue guidance within 7 days of the date of this order on agency implementation of this requirement for all agencies covered by this order.

75.     On September 16, 2021, the Task Force issued "guidance" whereby it imposed a deadline of November 22, 2021, for all covered Federal employees to become "fully vaccinated." The Task Force instructed that, depending on which vaccine Federal workers elected, the first vaccine shot would need to be administered by October 11, 2021, and the second dose no later than November 8, 2021.[62]

76.     The Task Force directed Federal agencies to "encourage employees to plan ahead and allow enough time to receive all required vaccine doses before the November 8 deadline to have their second shot." *Id.*

77.     The Order, requires all unvaccinated Federal employees to take a "vaccine" regardless of whether:

      i.   they can demonstrate natural immunity from a prior COVID-19 infection[63];

     ii.   they possess genes associated with natural immunity to a COVID-19 infection;

---

[62] https://www.saferfederalworkforce.gov/faq/vaccinations/
[63] See *Costen v. Biden*, Case 1:21-cv-02484, U.S. District Court of Columbia, filed September 23, 2021, where plaintiffs demonstrate that they are subject to the Order despite proof of natural immunity.

    iii.  their doctors advise them, based on their unique medical circumstances, that the risks of side effects outweigh the benefits of receiving the vaccine;

    iv.  they are pregnant;

    v.  they are attempting to or hope to become pregnant;

    vi.  they work entirely from their homes, or;

    vii. they rarely encounter coworkers or members of the public.

78.    Exemptions from the mandate are vaguely referred to as "by law" and, as designated by the Task Force, include only those that may be established through proof of a disability under the Rehabilitation Act or Americans with Disability Act ("ADA") or a deeply held religious belief under Title VII of the Civil Right Act. According to the Task Force:

> "Federal employees must be fully vaccinated other than in limited circumstances where the law requires an exception. In particular, an agency may be required to provide a reasonable accommodation to employees who communicate to the agency that they are not vaccinated against COVID-19 because of a disability or because of a sincerely held religious belief, practice, or observance. Determining whether an exception is legally required will include consideration of factors such as the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations, including protecting other agency employees and the public from COVID-19. Because such assessments will be fact- and context-dependent, agencies are encouraged to consult their offices of general counsel with questions related to assessing and implementing any such requested accommodations. Additional guidance on legally required exceptions will be forthcoming."[64]

79.    The Order and the guidance issued thus far provides no alternative to discipline and discharge for those employees who choose not to inject the novel mRNA "vaccine" unless those employees can establish an exemption via disability status or sincerely held religious belief.

80.    The Order contemplates no time in the future at which point "full vaccination" will no longer be required even though the first employees who were fully vaccinated in March 2021

---

[64] https://www.saferfederalworkforce.gov/faq/vaccinations/ (last visit September 24, 2021)

already have little, if any, enhanced protection, and, by March 2022, may have no "vaccine" durability at all.

81.     The Office of Management and Personnel (OPM), and individual agencies, are authorized to establish and/or approve medical standards for a Governmentwide occupations.[65]

82.     Under normal regulations, medical standards, "must be justified on the basis that the duties of the positions are arduous or hazardous, or require a certain level of health status for successful performance when the nature of the positions involves a high degree of responsibility toward the public or sensitive national security concerns. The rationale for establishing the standard must be documented and supported by a study(ies) or evaluation(s) establishing the medical standard is job-related to the occupation(s)." *Id.*

83.     Under the regulations, the Government has authority to require vaccinations, but only if for those "whose work may expose them or others to significant health or safety risks due to occupational or environmental exposure or demands."[66]

84.     Even when the Government determines that immunity to a particular disease is necessary due to the dangers imposed by a certain staffing position, if an employee can prove immunity through previous exposure, the vaccination will generally not be required. For example, the Coast Guard Medical Manual, discusses the following at COMDTINST M6000.1F[67]:

> "Measles, Mumps, and Rubella. Administer MMR vaccine to all AD and SELRES CG personnel born after 1957 (including accessions). Ensure they have received two lifetime doses of MMR vaccine **or have positive serologic test results**. Unless there is reason to suspect otherwise (e.g. childhood spent in a developing country, childhood immunizations not administered), a childhood dose of MMR vaccine may be assumed. Proof of immunity via serology testing or prior history of completed vaccination series (per medical documentation) will be accepted. Document immunization or results of proof of immunity in MRRS. For personnel whose records show receipt of bivalent measles-rubella vaccine, administration of MMR vaccine to achieve immunity against

---

[65] 5 CFR § 339.202 - Medical standards.

[66] See 5 CFR § 339.205 - Medical evaluation programs.

[67] Available at COAST GUARD MEDICAL MANUAL, COMDTINST M6000.1F (defense.gov)

mumps is not necessary as a military requirement, but may be appropriate in exceptional clinical circumstances."

85.    On September 9, 2021, President Biden laid out his "COVID Action Plan," which included an announcement that he had directed the Occupational and Safety Hazards Agency (OSHA) to require employees with 99 or more coworkers to either take the injections or take frequent tests for the COVID infection.[68]

86.    Plaintiff David A. Foley has been employed by the NLRB continuously since September 2009. He was appointed as the Regional Attorney for the 16th Regional Office of the NLRB on June 28, 2021.

87.    Plaintiff's position description contains no references to taking vaccinations or providing medical advice to employees. In his work at the NLRB, Plaintiff has never given medical advice or disciplined employees for matters related to their personal health.

88.    Plaintiff's duties include assisting the NLRB in carrying out its mission and goals, which include effectuating compliance with Executive Orders.

89.    As Regional Attorney, Plaintiff has managerial responsibility for roughly 25 employees. He is responsible for ensuring their compliance with agency directives and may be involved in issuing discipline.

90.    Plaintiff does not wish to disclose to his employer personal and private information about:

        i.    vaccination status;

       ii.    religious beliefs;

     iii.    political beliefs;

---

[68] https://www.documentcloud.org/documents/21060169-biden-covid-action-plan

      iv.   genetic data;

      v.   medical history

91.    Mr. Foley believes that a.) for many people, taking an mRNA injection is not medically prudent, and that b.) the mRNA injections are tarnished by the moral stain of being the product of aborted children.

92.    Mr. Foley cannot, in good conscience, "encourage" any employees to take any novel mRNA injection at any time and cannot, in good conscience, be involved in disciplining those who refuse.

93.    There is no evidence that Mr. Foley, who has been teleworking for more than a year, has contributed to COVID transmissions at a rate higher than vaccinated employees in the federal workplace.  There is little, if no, evidence that there is any difference between COVID-19 transmission rates, regardless of vaccination status, per the CDC's own documented findings.[69]

## FIRST CLAIM FOR RELIEF:
## DECLARATORY RELIEF FOR FIRST AMENDMENT RIGHTS

94.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

95.    When a public employee's speech relates to matters of public concern, government employers must give the employee leeway when speaking about it, even when the speech is at work. See *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty*., 391 U. S. 563, 568 (emphasizing the importance of balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

---

[69] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.

96.     In *West Virginia State Board of Education v. Barnette* 319 U.S. 624 (1943), and later

in *Wooley v. Maynard*, 430 U.S. 705 (1977), the United States Supreme Court recognized that

the First Amendment also protects a "concomitant" negative free speech right -- the right not to

speak: "The right of freedom of thought and of religion as guaranteed by the Constitution against

State action includes both the right to speak freely and the right to refrain from speaking at

all." Compelled speech can violate the First Amendment as surely as can a restraint on speech --

for example, a school may not require a student to salute a flag or to say the Pledge of

Allegiance. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought

protected by the First Amendment against state action includes both the right to speak freely and

the right to refrain from speaking at all."). *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624,

642 (1943) (observing that "[i]f there is any fixed star in our constitutional constellation, it is that

no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion,

or other matters of opinion or force citizens to confess by word or act their faith therein").

97.     The Order, as expounded upon by the Task Force "guidance," impermissibly

compels Plaintiff to encourage others to take novel mRNA injections despite their beliefs,

religious or otherwise, about the prudence and morality of injecting novel mRNA "vaccines."

98.     Accordingly, Plaintiff moves this Honorable Court for an Order declaring President

Biden's Executive Order 14043 unconstitutional pursuant to the First Amendment to the United

States Constitution.

### CLAIM 2:
### FAILURE TO INFORM IN VIOLATION OF
### THE ADMINISTRATIVE PROCEDURES ACT ("APA") AND
### THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

99.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations

in all preceding paragraphs.

100.    The Administrative Procedures Act, *5 U.S.C. §§ 500-706*, provides for judicial review to compel agency action if it is unreasonably delayed *(§ 706 (I))*, as well as judicial review for a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." Id. at *§ 702*. "Agency action" includes the "failure to act." Id. at *§ 551(13)*.

101.    When unreasonable delay occurs, courts may "compel agency action unlawfully withheld or unreasonably delayed," and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at *§§ 706(1) - (2)(A)*.

102.    The APA also requires that agencies give "prompt notice" after denying a petition and, "[e]xcept in affirming a prior denial or when the denial is self-explanatory," give "a brief statement of the grounds for denial." Id. at *§ 555(e)*.

103.    Defendant has a duty to timely respond to Plaintiff's Petition. See *5 U.S.C. § 555(b)*.

104.    Defendant has mandated firm deadlines for Plaintiff to become "fully vaccinated."

105.    Despite this, Defendant has failed to provide information about whether there are any other exemptions "by law" besides the Safer Federal Workforce Task Force prescribed religious and disability exceptions. If the Defendant possesses legal guidance about any other such exemptions, he should be compelled to disclose that information. Withholding such information may facilitate Defendant's stated goal of foisting mRNA injections onto citizens, but it violates their due process and procedural rights by keeping them unnecessarily in the dark.

106.    Similarly, Defendant has not provided guidance as to how Plaintiff can submit (should he so choose) an application for an exception or what the submission process will entail.

107.    Given the extremely limited timeframe by which Defendant demands Plaintiff receive an injection, the delay in promulgating an exemption policies and procedures extends far beyond the bounds of any ordinary or reasonable response time under the APA.

108.    Defendant's violation is ongoing and, as such, Plaintiff moves this Honorable Court to enter an Order declaring President Biden's Executive Order 14043 unconstitutional as violative of the Due Process clause of the Fifth Amendment of the United States Constitution, or, in the alternative, to enjoin its application until such time as Defendant has furnished information as to the full extent of available exceptions and the application process for which to apply for any available exceptions, and has processed all such exception applications to the stage of final agency decision.

### CLAIM 3:
### INJUCTIVE RELIEF SOUGHT TO PREVENT HARM
### STEMMING FROM FIFTH AMENDMENT AND NINTH AMENDMENT VIOLATIONS

109.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

110.    Plaintiff's administrative challenges to President Biden's vaccine mandate would be heard before the Merit Systems Protection Board (MSPB). As discussed above, the MSPB, having had its ranks duly cleansed or cowed by Executive Order 14043, will have been rendered a hostile forum.  Notwithstanding, the burden would remain the Government's to demonstrate a nexus between Plaintiff's purported misconduct and a failure of the efficiency of the service. *D.E. v. Dep't of the Navy, MSPB*, 721 F.2d 1165, 1166 (9th Cir. 1983). As the Government would be unable to sustain this burden, Plaintiff's claims would lie in due process violations.

111.    Due process is the means by which the Government may lawfully deprive an individual of his or her life, liberty, or property. *U.S. Const. Amend. V*. Public employers – whether state or

Federal – are covered by the due process requirements of the U.S. Constitution. While the Federal Government is covered by the Fifth Amendment and the states by the Fourteenth Amendment, the effect is the same. See *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) (explaining that, "when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause"); *Block v. Hirsh*, 256 U.S. 135, 159 (1921) (explaining that, "[t]he national government  by the Fifth Amendment to the Constitution, and the states by the Fourteenth Amendment, are forbidden to deprive any person of 'life, liberty, or property, without due process of law'").

112.    In 1978, Congress enacted the CSRA. S. Rep. 95-969, at 19, 24, 51-52 (1978 U.S.C.C.A.N. 2723, 2741, 2746, 2773-74).  In the CSRA, Congress recognized the importance of due process and an outside review procedure to ensure that adverse actions were merit-based and comported with constitutional requirements as established by Supreme Court decisions issued as of 1978. S. Rep. 95-969, at 40 (*1978 U.S.C.C.A.N. 2723, 2762*).

113.    The Supreme Court has recognized that the Ninth and Fifth Amendments protect an individual's right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990). The common law baseline is the touchstone out of which grew corresponding constitutional law. See, e.g., *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'"). See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser And Keeton On Law Of Torts § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp*., 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his

own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

114.     Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997). The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

115.     In *Mazares, Jr. v. Navy*, 302 F.3d 1382 (Fed. Cir. 2002), the captain of a Navy ship approaching hostile waters and facing enemy biological weapon production capabilities according to Department of Defense threat assessments, ordered civilian employees on the ship to take a vaccine that would guard against Anthrax bacteria. The captain terminated the employment of two civilian employees who refused to take the vaccine for insubordination, an action which was later upheld by the MSPB and the Federal Circuit. c.f *John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA only "on a voluntary basis"). This case is distinguishable from the case at bar where anthrax bacteria and its dangers, as opposed to SARS-CoV2, were well understood, the Anthrax vaccine, as opposed to the available COVID-19 mRNA injections, had been used by humans for decades, and mandated administration of the vaccine was narrowly tailored for military and national security purposes in stark contrast with President Biden's broadly writ and sweeping executive order. Additionally, military service members were

afforded a medical exemption from the anthrax vaccine. See, e.g., Coast Guard Anthrax Vaccine Immunization Program (Avip), Letter dated February 19, 2019[70].

116.     Given that Plaintiff is not involved in national defense, not in hostile waters, and is not being afforded the option of a medical exemption, and given that a novel mRNA injection is not a traditional vaccine with long lasting protection from COVID-19 or even demonstrably capable of mitigating transmission of COVID-19 once injected according to the CDC, the discussion provided by the court in *Mazares Jr. v. Navy* within the context of military defense provides little guidance to the case at bar.

117.     Even less instructive is *Jacobson v. Massachusetts*, 197 US 11 (1905). The *Jacobson* opinion dealt with smallpox – a disease that killed three out of ten of the people infected by the virus – and where the smallpox vaccine had been used in humans for more than ten years before it was mandated, and nearly one hundred years before the Supreme Court had ruled on the constitutionality of the mandate. In that case, the Supreme Court ruled that a mandate for a very effective and long-lasting *vaccine* promulgated by a state legislative body and narrowly deployed upon a local Cambridge, Massachusetts outbreak was constitutional. Such a ruling is of limited utility here considering that the case at bar involves a novel "mRNA vaccine" benefiting from less than one year of human use mandated by a single person broadly across a vast population of geographically diffuse Federal employees.

118.     Indeed, none of the "vaccine cases" upon which the Defendant will rely to argue that a rational basis review is appropriate deal with such a novel, broadly contentious mRNA therapy. Even those who have taken the injections may have done so only because of the perceived threat to their access to participation in the job market, and many regret it now. Reliance upon

---

[70] https://media.defense.gov/2019/Feb/19/2002090711/-1/-1/0/CI_6230_3D.PDF ("by competent medical authority or administratively exempted by command authority.")

traditional vaccine caselaw that dealt with narrowly tailored mandates of established therapies

for determining the outcome of the dispute at bar would be inappropriate.

119.    When a state policy implicates a fundamental right, through coercion or otherwise, the

strict scrutiny standard applies – "a law will not be upheld unless the government demonstrates

that the law is necessary to further a compelling governmental interest and has been narrowly

tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va.

2017).

120.    Defendant cannot show that he has a compelling interest in coercing the Plaintiff into

taking a COVID-19 "vaccine," because the President has no compelling interest in treating

employees with natural immunity any differently from employees who obtained immunity from

a vaccine. And regardless of natural immunity versus vaccine status, the CDC's own data

suggests that there is little difference between vaccinated and unvaccinated persons with respect

to the transmission of the current Delta variant of COVID-19.

121.    Whether strict scrutiny, heightened scrutiny, or rational basis review is used, the mandate

fails because it carves out only vague exemptions established "by law," and none for those that

may be necessitated  "by reason." Caprice is baked directly into the Order where it provides only

for vague "by law" exemptions. Thus, the Order is arbitrary, *per se.*

121.    An employee who is at high risk for suffering severe side effects from the injections and

low risk of severe outcomes from the underlying virus has no recourse unless he can prove that

his risk is associated with a disability; this is arbitrary and capricious.

122.    An employee whose identical twin has suffered a severe adverse reaction from novel

mRNA injections will still be compelled to undergo an injection pursuant to the Defendant's

vaccine mandate; this is arbitrary and capricious.

34

123.    An employee who has recently defeated a COVID-19 infection and who now possesses high levels of protective antibodies will be discharged, while an employee who underwent mRNA injections 9 months prior and now possesses few, if any, protective antibodies, remains employed; an arbitrary and absurd result.

124.    An employee who works exclusively via telework and has no physical interaction with coworkers or the public is required to receive an injection under the mandate's banner of providing a safer workplace and protecting the public; this is arbitrary and borderline absurd.

125.    The Order is arbitrary and not tailored to meet its stated objectives where the protective properties of the novel mRNA injections are temporary, as it is well-documented that they degrade significantly after six to eight months, yet the Order requires permanent job loss for refusal to undergo an injection. Clearly less restrictive means are available, such as telework, frequent virus and antibody testing, use of leave (paid or unpaid), and layoff.

126.    *If* the Order was ever a reasonable and constitutional use of power, the recent and unexpected rejection by the FDA of a third "booster shot" for the general population has rendered its continued enforcement arbitrary, again, in light of well-documented data establishing that the durability of one and two shot mRNA doses wanes after six months.

127.    Further evidence that Defendant's vaccine mandate is arbitrary is demonstrated by the mandate's effective coopting of the regulatory process for creating medical standards. See *5 CFR § 339.202* and *5 CFR § 339.25*. See *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring)("It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.")  Here, the Defendant – rather than directing his administration to implement novel mRNA "vaccine"

requirements under extant regulations – unilaterally and summarily issued a blanket vaccine

mandate himself and ordered his Safer Federal Workforce Task Force to implement a deadline

for vaccination within 7 days (despite the fact that the country is already on the other side of the

Delta spike). The arbitrary deadline requires Federal employees to choose between keeping food

on the table or undergoing an unwanted novel mRNA injection by October 11, 2021, while

providing no deadline or guidance for the exception application and determination process

utilized by Federal agencies. Indeed, whim and caprice abound.

128.    The Order is also arbitrary and unreasonable because the FDA approved brand-name

version of the injection is not widely available -- a fact which creates a de facto requirement that

employees take, under duress, Emergency Use Authorization injections in conflict with the EUA

statute, *21 U.S.C. § 360bbb-3*, which explicitly states that anyone to whom an EUA product is

administered must be informed of the option to accept or to refuse it, as well as alternatives to

the product and the risks and benefits of receiving it.

129.    Although the Fourteenth Amendment's Equal Protection clause is applicable to

states and lacks a corollary in the text of the Fifth Amendment, it is well established that an equal

protection right is found within the Fifth Amendment's "due process" clause when

"discrimination may be so unjustifiable as to be violative of due process." *Bolling et al. v.*

*Sharpe et al*, 347 US 497, 497 (1954). The President's arbitrary and capricious treatment

of unvaccinated Americans rises to the level of a discriminatory due process violation. The

President himself pontificated only three months ago about the virtue of protecting

those "populations sharing a particular characteristic, as well as geographic communities, who

have been systematically denied a full opportunity to participate in aspects of economic, social,

and civic life," and yet, here, he is systematically denying exactly that to a population that objects to a new and controversial treatment.

130.    In this regard, Federal employees and contractors are being treated more harshly than employees in the private sector, who are subject to Defendant's slightly less draconian, forthcoming OSHA mandate which at least provides for an "frequent testing" option in lieu of mRNA injection.

131.    When reviewing Executive Orders for "rational basis", the courts may consider plaintiffs' extrinsic evidence, of unconstitutional motivation. *Trump v. Hawaii*, 585 U. S. ___, ___, 138 S.Ct. 2392, 2417, 201 L.Ed.2d 775 (2018). Accordingly, the Defendant's own public statements demonstrate that he is willing to draft legally questionable Executive Orders in order to secure "dubious wins" by exploiting the protracted timeframe inherent to most forms of litigation. President Biden is on the cusp of achieving a "dubious win" here by forcing Federal employees to make the Hobson's choice between undergoing an unwanted mRNA injection and losing their livelihood derived from Federal employment. Such a mandate functions only to increase the percentage of vaccinated Federal employees while banishing from the Federal workforce those who object to the Defendant's arbitrary and capricious mandates that infringe upon their constitutional freedoms.  The Defendant's arbitrary and capricious mandate simultaneously ensures that banished Federal employees face hostile venues when seeking administrative recourse that are staffed only by "the vaccinated." The President repeatedly flaunts his questionable motives when he and his administration: 1) frequently malign and belittle the reasonable concerns held by those who object to undergoing mRNA injections; 2) direct ire towards the unvaccinated, and; 3) threaten to "run over" elected representatives who oppose federal injection mandates. Defendant's animus towards those who decline the injections,

along with his clear intent to use the blunt force of executive orders to achieve his will, coupled with the lack of reasonableness attached with such a broad and sweeping Order, clearly demonstrates that Defendant's Order violates the due process clause of the Fifth Amendment.

132.    Accordingly, Plaintiff moves this Honorable Court to enter an Order declaring President Biden's Executive Order 14043 unconstitutional as violative of the constitutional protections afforded the Plaintiff via the Fifth Amendment and Ninth Amendment of the United States Constitution.

Respectfully submitted this 29th day of September,

By: _____

David A. Foley
Texas Bar No. 24122807
David.Foley.JMJ@proton.com
(682)325-8378
1542 Wayside Dr.
Keller, Texas

By: _____

Daniel S. Flickinger
Alabama State Bar No. 9539N77F
dflick@gmail.com
205-470-6997
P.O. Box 36956
Hoover, AL 35236
*Pro hac vice application forthcoming*