UNITED STATES DISTRICT COURT
for the

Northern District of Texas

Fort Worth Division

Case No.   4:21-cv-01098-O

DAVID A. FOLEY

*Plaintiff*

**-v-**

|  |  |
|---|---|
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; LAUREN MCFERRAN, in her official capacity only as Chairman of the National Labor Relations Board (NLRB); JENNIFER ABRUZZO, in her official capacity only as General Counsel of the NLRB; KIRAN AHUJA, in her official capacity as the Director of the Office of Personnel Management and Co-Chair of the Safer Federal Workforce Task Force (SFWTF); Robin Carnahan, in her official capacity only as the Administrator of General Services Administration and Co-Chair of the of the SFWTF and Rochelle Walensky, in her official capacity only as the Director of CDC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

*Defendants*

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FROM PRESIDENTIAL EXECUTIVE ORDER NO. 14043**

### PARTIES

1.      The parties to this case are Plaintiff DAVID A. FOLEY, a private citizen domiciled in Tarrant County Texas, who holds the position of Regional Attorney with the National Labor Relations Board (NLRB) at its Sixteenth Regional Office, and the Defendants as follows: JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; LAUREN MCFERRAN, in her official capacity only as Chairman of the National Labor Relations Board (NLRB); JENNIFER ABRUZZO, in her official capacity only as General Counsel of the NLRB; KIRAN AHUJA, in her official capacity as the Director of the Office of Personnel Management and Co-Chair of the Safer Federal Workforce Task Force (SFWTF); ROBIN CARNAHAN, in her official capacity only as the Administrator of General Services and Co-Chair of the of the SFWTF and Rochelle Walensky, in her official capacity only as the Director of CDC, 1600 Clifton Road, NE, Mail Stop D-72, Atlanta, Georgia 30333, and as Member of the SFWTF.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 as it presents a federal question, and under 28 U.S.C. §§ 1343 as it involves the vindication of certain civil rights, and under 28 U.S.C. §§ 1361 as the requested relief involves compelling officers of the United States to perform duties owed to Plaintiff, and under the supplemental jurisdiction provisions of 28 U.S.C. §§ 1367. Additionally, this Court has jurisdiction over under "nonstatutory" equitable jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361, and 1651 (Writs).

3.      Plaintiff seeks and this Court is authorized to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure.

4.      Venue for this action properly lies in this in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides and works within the District.

5.       This Court's equitable powers permit it to issue "nonstatutory" injunctions to protect Plaintiff against wayward government actors engaged in unconstitutional conduct. See *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) (no waiver of sovereign immunity is needed when federal officers "take action in the sovereign's name" that is "claimed to be unconstitutional," which is precisely what Plaintiff here is claiming). *Id.* at 690. Therefore, as the Supreme Court had already "frequently … recognized" by the time it decided *Larson*, "a restraint may be obtained against the conduct of Government officials" without implicating sovereign immunity. *Id.* Because the President's Executive Order 14,043 is ultra vires and unconstitutional, Plaintiffs' claims fit within *Larson* and sovereign immunity does not shield the Order from review. The same is true of the Task Force Guidance and the Federal Employee Vaccine Mandate.

6.      *The Religious Freedom Restoration Act of 1993*, *42 U.S.C. §§ 2000bb to 2000bb-4* (*RFRA*) provides for relief as follows: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution." Plaintiff is aware of no cases in which the issue of whether the *Civil Service Reform Act* (October 13, 1978, Pub.L. 95–454, 92 Stat. 1111) (*CSRA*) may serve to preclude suits by federal employees under the *RFRA*, but given that the *RFRA* was enacted subsequent to the *CSRA*, and given the broad sweep

of its power, it is unlikely that the Defendants will argue that the *CSRA* can preclude claims arising under the *RFRA*.

7.      Simply put, the *RFRA* "is both a rule of interpretation for future federal legislation and an exercise of general legislative supervision over federal agencies." Laycock & Thomas, 73 Tex. L. Rev. at 211. It "operates as a sweeping 'super-statute,' cutting across all other federal statutes ... and modifying their reach." Michael S. Paulsen, A RFRA Runs Through It: Religious Freedom and the U.S. Code, 56 Mont. L. Rev. 249, 253 (1995).  See also *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)("Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases.") Since the *RFRA*'s adoption, Congress has maintained *RFRA*'s protections in every law it has passed—no statute, including the *CSRA*, has "explicitly exclude[d]" *RFRA*'s application.  There is little reason to believe that the *CSRA* could preclude Plaintiff's *RFRA* claims.

8.      Neither should the *CSRA* be read to preclude Plaintiff's other claims which are a "far cry" from the claim in *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2141 (2012), which was itself, a "far cry from the type of claim that Congress intended to channel through the [Merit Systems Protection Board]". *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2141 (2012)(Justice Alito dissenting).

9.      The facts in *Elgin* were different than the instance case in important ways.  In *Elgin*, petitioners sought to "to carve out an exception to *CSRA* exclusivity for facial or as-applied constitutional challenges to federal statutes". Specifically, petitioners were a small group of former federal employees who had been fired for failure to comply with the *Military Selective Service Act, 50 U.S.C.App. § 453*, a law which had been duly passed by Congress and signed into law more than sixty years before they brought their claims.  In the case at hand, Plaintiff is seeking relief not from a statute, but from an executive order which was suddenly, unilaterally, and controversially

enacted and which will have a sweeping effect on not a small cohort of employees, but rather upon thousands of employees across the federal government. The effected employees are largely Plaintiff's moral, racial, ethnic, religious, and political cohorts.

10.    The Order targets a distinct demographic of Americans who have: 1) been systematically marginalized and pushed out of public life, and 2) who make up the core of the President's political opposition.

11.    After the inauguration of Andrew Jackson in 1829, 10% of government officials (919 in total in those quaint days) were removed from office. Regarding this turnover, New York Senator William L. Marcy declared "to the victor belong the spoils" and was named the "Spoils system" under which employment by the federal government was synonymous with political patronage. Over time, the "Spoils system" became less celebrated and more despised, and Congress began to provide various federal employees with procedural rights and property interests in their jobs.

12.    Congress provided these rights in an ad hoc fashion that eventually became unmanageable. In 1978, Congress enacted the *CSRA* to replace the "outdated patchwork of statutes and rules" that afforded employees the right to challenge employing agency actions in district courts across the country. *Fausto,* 484 U.S. 439, 444–445 (1988). In enacting the *Civil Service Reform Act*, Congress did not intend to create for presidents a backdoor to the Spoils system which would allow them to purge the ranks of the federal government by imposing loyalty tests.

13.    Because the Order acts as a loyalty test and will have the effect of purging from the ranks of the federal government those employees who would provide the most support and sympathy to Plaintiff's worldview and plight, the Order frustrates Congress's purpose in passing the *CSRA* and deprives Plaintiff of a viable path for review under the *CSRA* system for review.

14.     Under *Thunder Basin*, 510 U.S. 200, 212-16 (1994), claims are inappropriately confined to administrative review if (1) administrative proceedings would "foreclose all meaningful judicial review"; (2) "the suit is wholly collateral to a statute's review provisions"; and (3) "the claim[] [is] outside the agency's expertise."

15.     Where Plaintiff's claims would be channeled through an adjudication system of agencies run only by those employees who pass the President's loyalty test and headed by political appointees who are responsible to the President, Congress would not have trusted the same to fairly assess Plaintiff's claims.  Nor is that adjudicative system capable of developing the necessary record for the litigation of this case.

16.     There is no hint in the congressional record that Congress intended the *CSRA* to prevent challenges to unilateral, systemwide actions by the Executive.  As such, this action is wholly collateral to that statute's review provisions.

17.     The claims here are also outside the expertise of the MSPB, which is precluded from evaluating the constitutionality of government action and has no expertise with respect to the efficacy of mRNA vaccines or assessing the contours of statutes such as the *Emergency Use Authorization* (*EUA*) statute, *21 U.S.C. § 360bbb-3(e)(1)(A)(ii)*.

18.     Thus, this case is not precluded and is properly before the United States District Court for the Northern District of Texas.

### NATURE OF THE CLAIMS AND RELIEF SOUGHT

19.     Plaintiff petitions the Court for declaratory and injunctive relief from "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for federal Employees*," Presidential Executive Order No. 14043, issued on September 9, 2021, by Defendant President Joseph R. Biden Jr., (the

Order),[1] which mandates that Plaintiff face employment termination if he refuses an unwanted mRNA injection in the coming days.

20.    Specifically, Plaintiff seeks  (A) an order ruling the Order null and void [*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ("A Law repugnant to the Constitution is void.")] or, in the alternative, (B) an order enjoining Defendant from compelling Plaintiff to speak in support of the Order or otherwise compelling Plaintiff to materially cooperate in enforcement of the Order against other federal employees, and/or (C) an order enjoining implementation of the Order until such time as Defendant has  provided sufficient information regarding available exceptions, available accommodations, information about the procedure for processing requests for exceptions, and has processed all exception requests to the level of a final agency determination, and/or (D) an order requiring that, prior to terminating Plaintiff, Defendant comply with *5 CFR § 630.401*, which requires that federal agencies allow employees to  use sick leave if they pose a health risk to coworkers because of potential exposure to communicable diseases, and (E) provide Plaintiff with compensation at an overtime rate for the time that Plaintiff has invested in this case as well reimbursement for the various costs incurred and the awarding of attorney fees, (F) consequential damages as may be accrued relating to job loss, (G) compensation for mental anguish. [see *Tanzin v. Tanvir*, 141 S. Ct. 486, 495 (2020)], and (H) reinstatement and a letter of apology if Plaintiff is discharged prior to the adjudication of this case.

21.    To understand the myriad problems with the Order, it is first necessary to reflect briefly on the history of vaccination and "vaccine" mandates beginning with smallpox, an ancient virus capable of killing 30% of those infected.[2] Variolation, a precursor to vaccination, was practiced as

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/09/09/executive-order-on-requiring-coronavirus-disease-2019-vaccination-for-federal-employees/ Document 11 Filed 10/03/21 Page 6 of 578 PageID 69
[2] https://www.cdc.gov/smallpox/history/history.html Document 11 Filed 10/03/21 Page 10 of 578 PageID 73

early as 1721. A safer and more effective method for preventing infections – vaccination – was developed in 1796. The smallpox vaccine was first used in the United States in 1799.

22.     After experiencing the deadly scourge of smallpox for centuries and benefiting from a decade of smallpox vaccine use in humans, in 1809, the Commonwealth of Massachusetts passed a law which empowered local governments to mandate the smallpox vaccine in response to local outbreaks. One hundred years later, the Supreme Court of the United States upheld[3] the right of the Commonwealth legislature to narrowly tailor vaccine mandates targeted at localized outbreaks.

23.     Defendant's Executive Order 14043 attempts to bootstrap the legislative and judicial history of conventional vaccines, like the smallpox vaccine, onto mRNA therapies. The marketers of these treatments have done well to attach the word "vaccine" to these products since mRNA injections might be more accurately described as "mRNA gene therapy."[4] Indeed, mRNA injections as well as Johnson & Johnson's adenovirus DNA injection[5] have much more in common with the latter, and those who would impose them onto the public should not profit by exploiting the storied history and legal holdings pertinent to the former.

24.     The Centers for Disease Control (CDC) describes the novel mRNA injection process as a "new type of vaccine." It goes on to explain that, while traditional vaccines "put a weakened or inactivated germ into our bodies," mRNA injections "teach" the cells of our bodies "how to make

---

[3] *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), a ruling that has was implicitly limited by the subsequent disavowals of its infamous progeny. See *Buck v. Bell,* 274 U.S. 200 (1927) ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind.").

[4] See "CDC Changes the Definition of Vaccines," Dr. Joseph Mercola, September 26, 2021, available at https://articles.mercola.com/sites/articles/archive/2021/09/25/cdc-changes-the-definition-of-vaccines.aspx (last visited September 26, 2021) See Document 11 Filed 10/03/21 Page 14 of 578 PageID 77

[5] https://www.nebraskamed.com/COVID/how-the-johnson-johnson-covid-19-vaccine-works

a protein – or even just a piece of a protein – which purportedly triggers an antibody-producing immune response, and [that] protect us from getting infected if the real virus enters our bodies."[6]

25.    Although the CDC represents that mRNA and adenovirus DNA injections are safe and effective, many Americans are unconvinced, and, as discussed infra, with good reason. Some 60,000,000 Americans prefer the role of control group during what would have heretofore been considered an early stage in the development cycle of a new vaccine.

26.    Tellingly, no legislature, state or federal, has passed a law requiring these injections. To the contrary, where legislative bodies have acted, they have acted to restrict injection mandates.[7] Including executive actions by governors, 12 states thus far, including Texas (the situs of the dispute), have taken actions that limit government or corporate authority to mandate injections.[8] A majority of states have filed suit against the federal Government over some aspects of the federal mandates.[9]

27.    Given that mRNA and DNA injections are controversial medical interventions and not traditional vaccines, and given that the mandate involves the administration of unwanted,

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mrna.html (last visited September 26, 2021) Document 11 Filed 10/03/21 Page 23 of 578 PageID 86

[7] See https://www.beckershospitalreview.com/workforce/11-states-banning-covid-19-vaccine-mandates-how-it-affects-healthcare-workers.html (last visited on September 26, 2021)("Indiana: On April 29, Republican Gov. Eric Holcomb signed a law prohibiting state or local governments from requiring anyone, including employees, to show proof of vaccination… Montana: On May 7, Republican Gov. Greg Gianforte signed a bill that prohibits discrimination based on vaccination status… New Hampshire: On July 26, Republican Gov. Chris Sununu signed a bill stating that employers may only mandate immunization as a condition of employment when a "direct threat" exists…North Dakota: On May 7, Republican Gov. Doug Burgum signed a bill prohibiting state government entities from requiring a private business to obtain documentation to verify an individual's vaccination status… Tennessee: On May 25, Republican Gov. Bill Lee signed a bill that prohibits a state agency, department or political subdivision from mandating COVID-19 vaccines… Utah: On March 16, Republican Gov. Spencer Cox signed a bill that prohibits state agencies from requiring people to get a COVID-19 vaccine as a condition of employment.) Document 11 Filed 10/03/21 Page 26 of 578 PageID 89

[8] Id.

[9] https://abcnews.go.com/Health/wireStory/11-states-file-suit-bidens-business-vaccine-mandate-80989771 Amd CPT Appx at 1

9

emergency use only[10] medical treatment upon federal employees, or else deprives them of a property interest, the Order should be reviewed under the standard of strict scrutiny, under which the Defendant must establish a compelling state interest and a narrowly tailored policy.

28.    The possibility of either a compelling state interest or a narrow tailoring are undermined by the recent admission of the producer of the only U.S. Food and Drug Administration (FDA) approved mRNA injection, Pfizer, that the potency of its injection wanes so significantly by six to eight months, that a "booster shot" is required at that time.[11] Unfortunately for Defendants, principled members of an FDA Advisory Committee recently refused to authorize a booster shot for the majority of the population.[12] This means that most "fully vaccinated" individuals are gradually losing any claim to have higher immunity than their un-injected neighbors.

29.    With the booster shot yet unapproved for the general population, the Order now paradoxically goes into effect just as the protections of the novel injections for those who took them between January and May vanishes.

---

[10] Although the FDA has approved Comirnaty, that injection has "certain differences" and is "legally distinct" from the widely available product that was mass-produced under an Emergency Use Authorization Pfizer. See https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine; Document 11 Filed 10/03/21 Page 28 of 578 PageID 91 The Food and Drug Administration, Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19) (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download Document 11 Filed 10/03/21 Page 32 of 578 PageID 95; Pfizer, Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-releasedetail/pfizer-and-biontech-announce-collaboration-brazils, Document 11 Filed 10/03/21 Page 40 of 578 PageID 103; Press Release, Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf; Document 11 Filed 10/03/21 Page 51 of 578 PageID 114

[11] See Evaluation of a Booster Dose (Third Dose), VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting Document 11 Filed 10/03/21 Page 55 of 578 PageID 118 6. https://www.fda.gov/media/152161/download ("Recent data from Israel and the United States…suggest that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months following the second dose…likely primarily due to waning effectiveness rather than due to Delta escaping vaccine protection") Document 11 Filed 10/03/21 Page 60 of 578 PageID 123

[12] https://www.fda.gov/news-events/press-announcements/fda-authorizes-booster-dose-pfizer-biontech-covid-19-vaccine-certain-populations, Document 11 Filed 10/03/21 Page 107 of 578 PageID 170

30.     Even more paradoxically, those who have recently survived COVID infections and whose bodies are protected by natural antibodies are subjected to the mandate.

31.     Plaintiff, who tested positive for COVID-19 on November 5, 2021, is less likely to contract and spread COVID than are comparator employees who have not been infected but who have received the temporary protections of the injections as far back in time as eleven months ago.

32.     Given this paradoxical state of affairs, Defendants can neither establish a compelling interest in the mandate, nor that the mandate is narrowly tailored.

33.     Far from a narrowly tailored action based on a compelling state interest, the Order is the despotic and irrational action of a President whose "patience" with the citizens who make their own healthcare decisions "is wearing thin," in contravention of his political interest[13] in increasing vaccination rates.[14]

34.     Lacking any cogent rationale, the President summarily tossed aside established regulatory procedures that would have otherwise facilitated the tailoring of reasonable vaccination requirements to the risks of COVID-19 transmission unique to the federal employment positions. Indeed, initially Defendant had ordered that federal employees either undergo injections or else undergo regular testing.[15] But, before that order could be implemented, Defendant vacillated and ordered that all employees undergo injections unless they can establish "exceptions as required by law."

---

[13] Defendant's goal was that 70% of the citizens would be vaccinated by July 4, 2021. See https://abcnews.go.com/Politics/white-house-concedes-us-hit-bidens-70-vaccination/story?id=78419718 (last checked September 28, 2021) Document 11 Filed 10/03/21 Page 111 of 578 PageID 174

[14] See https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ ("We've been patient, but our patience is wearing thin.") Document 11 Filed 10/03/21 Page 117 of 578 PageID 180

[15] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/29/remarks-by-president-biden-laying-out-the-next-steps-in-our-effort-to-get-more-americans-vaccinated-and-combat-the-spread-of-the-delta-variant/ Document 11 Filed 10/03/21 Page 130 of 578 PageID 193

11

35.    Indeed, if the Order was intended to keep the workforce and the public it purportedly serves healthy, Defendants would have no problem honoring their commitments under *CFR § 630.401* and approving Plaintiff's request to use 615 hours of the sick leave, which would keep him employed until March 14, 2021.  According to that regulation, "an agency ***must*** grant sick leave to an employee when he or she…[w]ould, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by his or her presence on the job because of exposure to a communicable disease." If Plaintiff poses a threat of transmitting communicable diseases until "vaccinated", Defendants *must* grant him leave, but instead choose to discharge him.

36.    The President issued the Order under the auspices of the "efficiency of [the] service" where his stated goal was to render the federal workplace safer for employees and for members of the public who interface with those employees. But the actual goal is rote vaccination guideline compliance, a goal which has some overlap with the goal of safety improvement, but which remains distinct from it.

37.    Where the Order allows exceptions only if "required by law," it necessarily forecloses circumstances where exceptions would be *reasonable or rational* and bakes into the Order a rigid inflexibility on the part of federal agencies to permit reasonable and rational exceptions to the COVID-19 vaccine mandate. In so doing, it assures arbitrary applications. Thus, even under a "rational basis" standard of review, the Order fails because it demands arbitrary results.

38.    The Order creates an irrational and irrebuttable presumption[16] that vaccinated employees are safer than their un-injected peers and it deprives a class of citizens of their equal protection

---

[16] See e.g. *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632 (1974)(irrational presumption that pregnant women would eventually become physical incapacitated for a certain period of time); *U.S. Dep't of Agriculture v. Murry*, 413 U.S. 508, 513-24 (holding that a determination of an individual's need for food stamps based on the income of

under the law.  In so doing, Defendant's Executive Order 14043 deprives federal employees of vested interests in employment positions without providing them with due process, running afoul of the Fifth and Ninth Amendment protections available to federal employees.

39.      The Order's "exceptions as required by law" are limited to two circumstances: exceptions under Title VII of the *Civil Rights Act of 1964* for those whose deeply-held religious beliefs compel them to reject the novel injections and exceptions under the *Rehabilitations Act* and or *Americans with Disabilities Act* for those whose disabilities prevent them from safely suffering the novel injections.[17]

40.      Although the deadline to attesting to "full vaccination" has now come and gone, little further guidance on exceptions or the process for granting them has been provided. If, as it appears, these are the only available exceptions, arbitrary results must follow.

41.      An employee who is at high risk for suffering severe side effects from the injections and low risk of severe outcome from a SARS-CoV-2 infection has no recourse unless he can prove that his risk is associated with a disability; this is arbitrary.[18]

42.      An employee who has recently defeated a COVID infection and who can establish high levels of protective antibodies (such as this Plaintiff) would be discharged under the Order, while an employee who received injections eleven months prior would remain employed, despite the fact

---

that individual's non-minor children claimed as dependents created an irrebuttable presumption that was "not a rational measure of the need of the household")

[17] https://www.saferfederalworkforce.gov/faq/vaccinations (last visited September 26, 2021) ("Q: Are there exceptions to the requirement for all employees to be fully vaccinated? A…In particular, an agency may be required to provide a reasonable accommodation…because of a disability or because of a sincerely held religious belief, practice, or observance…Additional guidance on legally required exceptions will be forthcoming.") Document 11 Filed 10/03/21 Page 151 of 578 PageID 214

[18] See *Pa. Dep't of Transp. v. Clayton*, 684 A.2d 1060, 1065 (Pa. 1996)( regulation which provided revocation of one's operating privilege for a period of one year upon the occurrence of only a single epileptic seizure, without the licensee having an opportunity to present medical evidence in an effort to establish his or her competency to drive, violates due process.)

that the "vaccinated" employee maintains little, if any, remaining protection from the injections; an arbitrary result.

43.    An employee who works exclusively via telework and has little to no interaction with the general public would be compelled to undergo an injection in the name of making the workplace safer and protecting the public; this is arbitrary, if not absurd.

44.    Likewise, despite the fact that the protective properties of the injections wane significantly by the sixth month[19] and are effectively rendered temporary, the Order rigidly provides for only the "permanent" solution of employment termination.

45.    The Order allows employees to fulfill the mandate if they receive or have received any World Health Organization (WHO) authorized "vaccines" despite that, even according to the WHO, some of those medical products are significantly less effective than post-infection natural immunity and despite the fact that American medical institutions have yet to determine whether they are either safe or effective

46.    If unvaccinated federal workers are a danger to their coworkers, such a hazard could be mitigated through changes to schedules such as telework or scheduling work for times when others are absent, or (in the worst case) through a temporary lay-off rather than a termination for insubordination. Recall from employee lay-off would be appropriate when injection durability wanes among the "vaccinated" population, or, when a variant spike during the pandemic has receded.[20]    The threat of permanent job loss for refusal to take an injection which is only

---

[19] See *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download ("Recent data from Israel and the United States…suggest that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months following the second dose…likely primarily due to waning effectiveness rather than due to Delta escaping vaccine protection") Document 11 Filed 10/03/21 Page 55 of 578 PageID 118

[20] See for instance the Russian treatment of its public employees. https://www.loc.gov/item/global-legal-monitor/2021-06-22/russian-federation-unvaccinated-employees-can-be-suspended-without-pay/(" the minister of

temporary in nature is arbitrary and strongly suggests that the entire purpose of the Defendant's Order is to coerce injection compliance rather than improve workplace safety.

47.   *If* the Order was ever a reasonable and constitutional extension of the Defendant's executive branch authority, the recent and unexpected rejection of the third dose "booster shot" by the FDA for anyone other than at-risk elderly populations[21] has rendered its continued enforcement arbitrary and capricious.

48.   While the Order recognizes that the law might interfere with Defendant's ability to force certain federal employees to receive the injections, the Order fails to provide exceptions for those whose consciences prevent them from providing material support to the President in encouraging and punishing other employees to achieve compliance. In this regard, the Order compels speech in violation of the First Amendment.

49.   Plaintiff, a member of the Catholic Church who rejects any medical or nonmedical intervention which interferes with the dignity of life such as hormonal contraception and abortion-inducing drugs and procedures, considers the injections evil, and his sincerely held faith and religious practice would be burdened by receiving any of them.

50.   Meanwhile, given that the visible Head of the Catholic Church has endorsed the injections, Plaintiff's religious practice has already been burdened by being forced to explain his beliefs and would be further burdened were he forced to describe them more fully.

---

labor of the Russian Federation stated that while the Labor Code does not allow termination of employment for those who refuse to get the vaccine, unvaccinated employees can be suspended from work without pay if mandatory vaccination has been declared in the region by the region's chief doctor of sanitation"). Document 11 Filed 10/03/21 Page 157 of 578 PageID 220

[21] See 6:56 of FDA Advisory Committee Sep 17, 2021 on Application of Pfizer for a "booster" shot (https://youtu.be/WFph7-6t34M (last visited September 26, 2021).

**IRREPARABLE HARM**

51.     As discussed in further detail, infra, Presidential Executive Order No. 14043, issued on September 9, 2021, by Joseph R. Biden Jr., "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for federal Employees*" (the Order), is unconstitutional on numerous grounds.

52.     The President has demonstrated a willingness to take knowingly unconstitutional executive action in order to achieve his purposes in the time between his orders and eventual court rulings—time is on his side.[22]

53.     Plaintiff will likely succeed in his challenges to the Order, but the remedies available at the conclusion of such challenges, absent injunctive and declaratory relief, will be insufficient to undo the damages caused by certain harms that are likely to befall the Plaintiff, as an affected employee of the federal Government and as a member of the public that is served by affected federal employees.

54.     The likely harm faced by Plaintiff depends on the decisions he must soon make in this Hobson's choice of either acceding to the President's demands that he suffer a novel injection or face discharge for refusing to do so.

55.     Should Plaintiff succumb to the pressure of the threatened job loss, at a minimum, he will have received an invasive medical treatment that is contrary to his conscience and desires.

---

[22] See e.g. https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/03/remarks-by-president-biden-on-fighting-the-covid-19-pandemic/ ("Well, look, the courts made it clear that the existing moratorium was not constitutional; it wouldn't stand... I've sought out constitutional scholars to determine what is the best possibility that would come from executive action, or the CDC's judgment, what could they do that was most likely to pass muster, constitutionally. The bulk of the constitutional scholarship says that it's not likely to pass constitutional muster… Whether that option will pass constitutional measure with this administration, I can't tell you. There are a few scholars who say it will and others who say it's not likely to. But, at a minimum, by the time it gets litigated, it will probably give some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money. That's why it was passed in — in the act that we passed in the beginning of my administration, and it went to the states.") Document 11 Filed 10/03/21 Page 176 of 578 PageID 239

56.    Furthermore, Plaintiff will likely suffer the known and established (if downplayed) side effects associated with the mandated injections, which include pain, redness, and swelling at the injection site, as well as fatigue, headache, muscle pain, chills, fever, and nausea.[23]    Absent injunctive and declaratory relief, no final order after protracted litigation will prevent Plaintiff from experiencing known injection-induced maladies that were otherwise avoidable absent the President's vaccine mandate at bar.

57.    Furthermore, Plaintiff may suffer more severe documented side effects[24] such as anaphylaxis[25], myocarditis[26], pericarditis, Bell's palsy[27], other disabling illnesses[28], miscarriage[29], infertility, and death[30]. Absent injunctive and declaratory relief, no order granted after protracted litigation can restore cardiac function, prevent lost earnings, bear offspring from damaged reproductive organs, or resurrect dead employees.

58.    Plaintiff might furthermore suffer from unknown side effects if coerced into undergoing a series of undesired and unneeded novel mRNA injections.[31]

---

[23] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html (last visit September 26, 2021) Document 11 Filed 10/03/21 Page 181 of 578 PageID 244.

[24] As of September 17, 2021, 66,642 unverified claims of side effects requiring hospitalization, 82,645 requiring urgent care visits, and 114,127 had been reported on the on the Vaccine Adverse Event Reporting System (VAERS). https://openvaers.com/covid-data/hospitalizations; https://openvaers.com/covid-data/urgent-care; https://openvaers.com/covid-data/office-visits   Document 11 Filed 10/03/21 Page 184 of 578 PageID 247

[25] As of September 17, 2021, 6,378 unverified claims of anaphylaxis caused by the injections had been reported on VAERS  https://openvaers.com/covid-data/anaphylaxis Document 11 Filed 10/03/21 Page 189 of 578 PageID 252

[26] As of September 17, 2021, 6,812 unverified claims of myocarditis or pericarditis caused by the injections had been reported on VAERS  https://openvaers.com/covid-data/cardiac#myocarditis Document 11 Filed 10/03/21 Page 190 of 578 PageID 253

[27] As of September 17, 2021, the 8,326 unverified claims of Bell's palsy caused by the injections had been reported on VAERS https://openvaers.com/covid-data/bellspalsy Document 11 Filed 10/03/21 Page 191 of 578 PageID 254

[28] As of September 17, 2021, the 20,789 unverified claims of permanent disability caused by the injections had been reported on VAERS https://openvaers.com/covid-data Document 11 Filed 10/03/21 Page 193 of 578 PageID 256

[29] As of September 17, 2021, the 8,326 unverified claims of miscarriage caused by the injections had been reported on VAERS https://openvaers.com/covid-data/reproductive-health Document 11 Filed 10/03/21 Page 195 of 578 PageID 258

[30] As of September 17, 2021, the 15,386 unverified claims of death caused by the injections had been reported on the VAERS https://openvaers.com/covid-data/mortality Document 11 Filed 10/03/21 Page 197 of 578 PageID 260

[31] See Roxana Bruno, Peter A Mccullough, Teresa Forcades I Vila, et al. *SARS-CoV-2 mass vaccination: Urgent questions on vaccine safety that demand answers from international health agencies, regulatory authorities,*

59.    Should Plaintiff not allow President Biden to dictate his personal medical decisions, he will face a different slate of irreparable harms depending on whether he attempts to prove an exception or refuses the injections outright without claiming a disability or religious exemption.

60.    With respect to religious exemption, Plaintiff has already informed Defendants about the nature of his religious objections both to the injections themselves as well as to the Defendant's further inquisition about the same beliefs. In this regard, he has already been injured and will be injured further if the inquisition continues.

61.    In the likely event that Defendant will fail to grant an accommodation to Plaintiff, he faces the certain prospect of termination- "the capital punishment of the workplace."  Absent injunctive relief, a prolonged legal challenge may pave the road to backpay and reinstatement, but backpay and return to the same position previously held will not remedy the economic harm suffered while traveling down that road, including the possibility of defaulting on debts and mortgages, damaged credit, loss of insurance, inability to pay medical bills, and potential home loss.

62.    Absent injunctive and/or declaratory relief, protracted litigation cannot restore loss of experience suffered through job loss with the federal Government. Most career paths within the federal Government, including the Plaintiff's career path, are entirely reliant upon internal experience. In Plaintiff's case, the next rung on his career ladder would be Regional Director, a position for which he will be unable to gain relevant experience outside of the federal Government. Absent injunctive and/or declaratory relief, the complete loss of career experience between his termination and reinstatement cannot be restored.

---

*governments and vaccine developers*; Authorea. May 24, 2021.
*https://www.authorea.com/doi/full/10.22541/au.162136772.22862058* Document 11 Filed 10/03/21 Page 200 of 578 PageID 263

63.    One of the key recruitment incentives that the federal government offers its employees is the promise of job stability. For a citizen who sought out a stable position, the looming threat of the discharge unrelated to job performance is already placing a toll on Plaintiff, and discharge will only cause further emotional turmoil and distress.  Being injected with a series of novel and hastily created injections has never been a condition of Plaintiff's employment in his twelve years of service to the federal Government. Absent injunctive and/or declaratory relief, a final Order after protracted litigation cannot remedy snowballing turmoil and distress associated with termination and loss of livelihood by refusing novel medical interventions that have suddenly been mandated by President Biden as a condition of federal employment.

64.    Should Plaintiff seek a medical exception to the mandate, he will be subjected to all the harms above if his exception request fails. Likewise, by now being compelled by the President's mandate to submit medical requests under duress (threat of job loss), Plaintiff will face the irreparable harm of being likewise compelled to reveal otherwise private-until-now information to his employer, including, but not limited to, personal medical history, family medical history, genetic composition, religious beliefs, and political beliefs. Such private information will be further exposed to the general public if exceptions are denied, because Plaintiff would then be compelled to divulge this information while seeking judicial recourse.

65.    Plaintiff is part of a movement of employees within the federal government who are opposed to injections and/or injection mandates for scientific and moral reasons. These employees work across many agencies, including at regulatory agencies like the FDC and the CDC. If Plaintiff is discharged now, it will be too late for him to have a voice in ongoing policy determinations by the time he is offered reinstatement.

66.    In addition to suffering irreparable harm with respect to the above, Plaintiff whose responsibilities include labor relations and management of roughly 25 employees will be harmed by the Order because he will inevitably be tasked with encouraging/compelling subordinates to undergo injections, and he will inevitably be tasked with facilitating the discipline and discharge of those who refuse. Plaintiff should not be compelled to make statements about novel medical interventions to which he objects. Nothing other than swift injunctive relief could mitigate such irreparable harm.

67.    The public that is served by federal employees, including Plaintiff who is likewise a member of the public, will also suffer harm from a federal workforce that has been systematically stripped of employees who dissent from the majoritarian "consensus" regarding the utility of novel medical injections. As President Biden wrote in an earlier executive order, "the federal Government is at its best when drawing upon all parts of society, our greatest accomplishments are achieved when diverse perspectives are brought to bear to overcome our greatest challenges."[32]

68.    The cleansing of viewpoint diversity from the ranks of the federal government will irreparably harm the public, including Plaintiff. Should institutions such as the Centers for Disease Control and Prevention ("CDC"), the Food and Drug Administration ("FDA"), the Merit Systems Protection Board ("MSPB"), and the Department of Justice ("DoJ"), be cleansed of those who dissent on this important question of our day, these agencies no longer draw from "diverse perspective," and the 62 million Americans, including Plaintiff, who choose not to receive this medical intervention will no longer find advocates within the federal bureaucracy. Absent injunctive and/or declaratory relief, a final judgment entered after protracted litigation cannot possibly remedy the harm faced by the public in the interim period. Such irreparable harm is not

---

[32] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/25/executive-order-on-diversity-equity-inclusion-and-accessibility-in-the-federal-workforce/  Document 11 Filed 10/03/21 Page 210 of 578 PageID 273

limited to the public in general, but rather has a high likelihood of harming Plaintiff in a predictable manner.

69.     Assuming Plaintiff is discharged, he would ordinarily contest his discharge at the "quasi-judicial" forum of either the Merit Systems Protection Board[33] or the Equal Employment Opportunity Commission (EEOC).[34]   At that time, the MSPB and the EEOC will have been cleansed of like-minded or otherwise free-thinking advocates who oppose President Biden's injection mandate. Moreover, Plaintiff can expect that other similarly cleansed agencies such as the CDC and FDA will provide Defendant with "scientific authority" to defend his case of unlawful discharge that are even more biased, arbitrary, and capricious than what is currently promulgated. Thus, Plaintiff can neither expect viewpoint diversity nor a fair shake when the injection-as-condition-of-employment has deprived him of institutional allies throughout all agencies of the Executive Branch.

70.     By the spring of 2020, the novel coronavirus (SARS-CoV-2), which causes COVID-19 infections, enveloped the globe. COVID-19, via its myriad variants continues to infect significant portions of the populations of Texas and the Unites States. Institutions took various steps to combat the spread of COVID-19, including investment in the development of preventative treatments.

71.     Risk factors for severe illness from COVID-19 include older age, male gender, in addition to age and gender independent comorbidities such as diabetes mellitus, cardiovascular disease, hypertension, chronic kidney disease, cancer, obesity, and smoking.[35] Furthermore, the severity of COVID-19 infections has a genetic component. Id.

---

[33] https://www.federalregister.gov/agencies/merit-systems-protection-board (describing the MSPB) Document 11 Filed 10/03/21 Page 227 of 578 PageID 290

[34] See discussion of EEO processes pages 5-6 of https://rrb.gov/sites/default/files/2017-05/ineffi.pdf Document 11 Filed 10/03/21 Page 228 of 578 PageID 291

[35] *An immunogenetic view of COVID-19* Genet Mol Biol. 2021; 44(1 Suppl 1): e20210036; Published online 2021 Aug 25. doi: 10.1590/1678-4685-GMB-2021-0036, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8388242/ (last visited September 26, 2021) Document 11 Filed 10/03/21 Page 251 of 578 PageID 314

72.     Conventional vaccines prevent many millions of illnesses and save numerous lives every year. As a result of the widespread acceptance of childhood inoculation, the smallpox virus has been completely eradicated and the prevalence of polio, measles and other childhood onset diseases has been drastically reduced around the world. Conventional vaccines are derived through the use of live attenuated and inactivated pathogens and provide relatively durable protection against a variety of dangerous diseases.

73.     The leading "vaccines" developed in response to COVID-19 are described as "mRNA Vaccines," which differ substantially from conventional vaccines. As reported by the Miami Herald on September 9, 2021, the CDC recently changed the definition of "vaccine" seemingly to obfuscate the distinction between traditional vaccines and mRNA injections:

> "Before the change, the definition for 'vaccination' read, 'the act of introducing a vaccine into the body to produce <u>immunity</u> to a specific disease.' Now, the word "immunity" has been switched to '<u>protection</u>.'
>
> The term 'vaccine' also got a makeover. The CDC's definition changed from 'a product that stimulates a person's immune system to produce immunity to a specific disease' to the current 'a preparation that is used to stimulate the body's immune response against diseases.'"

74.     Incidentally, by the CDC's new definition, potential therapies such as an Ivermectin regimen, or even a lozenge containing the mineral Zinc, could be defined as "vaccines" because they stimulate immune response against diseases.[36] But the President has no more right to coerce federal employees into taking "off-label" medications or vitamins than he does to make them (under threat of employment loss) eat their vegetables.[37] exercise, or consume only moderate

---

[36] https://www.mayoclinic.org/drugs-supplements-zinc/art-20366112 (last reviewed September 28, 2021) Document 11 Filed 10/03/21 Page 275 of 578 PageID 338

[37] The concept of an individual's right to maintain the sovereignty of what he puts into his body is an ancient one and is still recognized today.  See e.g., Daniel 1:8-16 "But Daniel was resolved not to defile himself with the king's food or wine; so he begged the chief chamberlain to spare him this defilement."; *Dowdy-El v. Caruso*, No. 06-11765, 2013 WL 6094695 (E.D. Mich. Nov. 20, 2013)(requiring the provision of Kosher food for Muslim inmates);

servings of sugar, even though these measures would surely assist in combatting COVID-19 and obesity, among many other potential health crises.

75.    Recent definitional changes and the "evolving" understanding of what constitutes a "vaccine," should not – like recent changes in the definition of "marriage" or "sex" – be retrofitted into caselaw. It remains factually and legally important to distinguish between those cases where "vaccines" have been required and those where novel synthetic spike protein therapies have been required.

76.    Federal employees can comply with Order by receiving any "injection authorized for emergency use by the U.S. Food and Drug Administration or that has been listed for emergency use by the World Health Organization." All such medical products were hastily produced, some of them have not been tested by American regulators, and some of very low efficacy.  For instance, the Chinese Sinovac Vaccine has been approved by WHO, which itself determined that this vaccine prevented *symptomatic* disease in just 51% of those who received it.[38]

77.    To hasten the production of preventative treatments, President Trump ordered "Operation Warp Speed," resulting in three separate COVID-19 "vaccines" that have been developed, approved, and circulated among the human population more swiftly than any other vaccine in our nation's history. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine ("Pfizer mRNA Vaccine")

---

*Commissioner v. Coleman,* Conn: Supreme Court 2012 ("'[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'") *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990)("the 'notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment'" and "'[t]he logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.")

[38] See WHO Validates Sinovac COVID-19 Vaccine for Emergency Use and Issues Interim Policy Recommendations, WHO.INT (June 1, 2021), available at bit.ly/3yitIW7 (last visited Oct. 28, 2021) Amd CPT Appx at 6.

on December 11, 2020.  Just one week later, the FDA issued a second EUA for the Moderna COVID-19 Vaccine ("Moderna mRNA Vaccine"). On August 23, 2021, the FDA approved the Pfizer mRNA Vaccine under the brand name, "Comirnaty."[39] However, the product that the FDA approved – "Comirnaty" – is not widely available. The "similar" – not chemically identical – product, which was distributed subject to EUA, is being distributed "interchangeably."[40]

78.      The protections offered by these novel "vaccines" are not absolute as they range anywhere from 67% to 96% effective at mitigating severe COVID-19 infections at the time protection takes hold – typically two weeks after the final injection. It is well documented that "fully vaccinated" individuals can contract and spread the COVID-19 virus.[41] Indeed, the CDC openly admits that there is insufficient data as to whether the "vaccinated" transmit COVID-19 any less than the "unvaccinated" with respect to the current Delta variant of SARS-CoV-2 infections.[42]

79.      Whatever protections the mRNA "vaccines" initially provide degrade over time.  The duration of such protection is currently unknown. However, according to Pfizer, recent research suggests "that vaccine protection against COVID-19 infection wanes approximately 6 to 8 months

---

[39] https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine. Document 11 Filed 10/03/21 Page 279 of 578 PageID 342

[40] Although the FDA has approved Comirnaty, that injection has "certain differences" and is "legally distinct" from the widely available product that was mass-produced under an Emergency Use Authorization Pfizer injection product which is widely available. See https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine; Document 11 Filed 10/03/21 Page 279 of 578 PageID 342 The Food and Drug Administration, Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19) (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download; Pfizer, Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-releasedetail/pfizer-and-biontech-announce-collaboration-brazils; Press Release, Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf.

[41] https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last reviewed September 28, 2021) Document 11 Filed 10/03/21 Page 284 of 578 PageID 347

[42] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html. Document 11 Filed 10/03/21 Page 288 of 578 PageID 351

following the second dose."[43] For that reason, Pfizer sought FDA approval for a 3rd booster shot. On September 19, 2021, the FDA Advisory Board voted to deny approval of the 3rd booster shot for anyone other than those over the age of 65, or those over age 50 with high-risk comorbidities. CDC Director Rochelle Walensky, in a rare flex of administrative authority, unilaterally overruled the advisory board to extend booster shot availability to those who work in high-risk professions, as well as those aged 18-48 who possess high-risk comorbidities.[44]

80.    Another EUA approved product is the Janssen Vaccine, which provides immunity protection of somewhere between 66% and 85%. The Janssen Vaccine was developed using the cells of aborted children. The Janssen Vaccine has not obtained FDA approval.

81.    By May 22, 2021, one-third of the US adult population was considered "fully vaccinated." There is little evidence suggesting that these "fully vaccinated" people will maintain lasting protection by November 22, 2021 – President Biden's deadline for federal employees to achieve "fully vaccinated" status[45].

82.    For the vast majority of the population, natural immunity is sufficient to defeat the COVID-19 virus without suffering severe infection. In general, the younger and healthier the individual, significantly less likely is the case that such an individual will contract a COVID-19 infection resulting in serious illness.[46]

---

[43] *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September
17, 2021 meeting. https://www.fda.gov/media/152161/download  Document 11 Filed 10/03/21 Page 55 of 578 PageID 118
[44] https://www.cnbc.com/2021/09/23/covid-booster-shots-cdc-panel-endorses-third-pfizer-doses-for-millions.html.
[45] https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna ("How long will Comirnaty provide protection? Data are not yet available to inform about the duration of protection that the vaccine will provide.") Document 11 Filed 10/03/21 Page 333 of 578 PageID 396
[46] *America's Frontline Doctors White Paper On Experimental Vaccines For COVID-19*, June 1, 2021, available at https://americasfrontlinedoctors.org/files/americas-frontline-doctors-white-paper-on-experimental-vaccines-for-covid-19/ (last visited September 26, 2021). Document 11 Filed 10/03/21 Page 335 of 578 PageID 398

83.     Plaintiff, a healthy 40-year-old man, tested positive for COVID-19 on November 5, 2021, the first day that he felt symptoms. His symptoms, which included low fever and fatigue, were sufficient to cause him to miss the afternoon of one day of work.  He recovered fully in two days.

84.     People who have contracted and defeated COVID-19 develop antibodies to the virus. Natural antibodies are at least as effective at mitigating COVID-19 infections as are "vaccine" derived antibodies. *Id.* A person's levels of natural antibodies can be detected through antibody testing. Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust, durable, and long-lasting as that achieved through vaccination.[47]

85.     In recognition of the highly protective character of natural immunity, the European Union has recognized "a record of previous infection" as a substitute for any vaccine passport requirements. Even France's controversial new restrictive mandate on the ability to participate in daily life focuses on a person's immunity rather than their vaccine status—treating natural immunity and vaccine immunity equally.[48]

---

[47] Nabin K. Shrestha, et al., Necessity of COVID-19 Vaccination In Previously Infected Individuals, MEDRXIV (June 5th, 2021), available at https://bit.ly/2TFBGcA  (last visited Aug. 1, 2021) Document 11 Filed 10/03/21 Page 369 of 578 PageID 432; see also Yair Goldberg, et al., Protection of Previous SARS-Cov-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel, MEDRXIV (Apr. 20, 2021), available at https://bit.ly/3zMV2fb  (last visited Aug. 1, 2021); Smerconish, Should Covid Survivors and the Vaccinated Be Treated the Same?: CNN Interview with Jay Bhattacharya, Professor of Medicine at Stanford University (June 12, 2021), available at https://cnn.it/2WDurDn (last visited Aug. 1, 2021); Marty Makary, The Power of Natural Immunity, WALL STREET JOURNAL (June 8, 2021), available at https://on.wsj.com/3yeu1Rx (last visited Aug. 1, 2021). Indeed, the CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people. Where's the data?, WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ  (last visited July 30, 2021). Document 11 Filed 10/03/21 Page 433 of 578 PageID 496

[48] See, e.g., Clea Callcutt, France forced to soften rules after coronavirus green pass backlash, POLITICO (July 20, 2021), available at https://politi.co/3f9AZzS  (last visited July 29, 2021). Document 11 Filed 10/03/21 Page 439 of 578 PageID 502

86.     Similarly, the United States requires everyone, including its citizens, to provide proof of a negative COVID-19 test before returning to the country from abroad. Documentation of recovery suffices as a substitute, although proof of vaccination does not.[49]

87.     Federal researchers at the National Institute of Health recognized natural immunity as early as January 2021.

88.     In May 2021, researchers in Ireland determined reinfection by infected-and-recovered patients was uncommon.

89.     In June 2021, the Swedish public health agency reported that naturally infected and recovered persons have a more durable and reliable immune response to COVID-19 than those who are vaccinated.

90.     In August 2021, researchers in Israel concluded that natural immunity confers longer lasting immunity and stronger protection than those who are vaccinated.

91.     Researchers in the United States have begun to acknowledge that natural immunity to COVID-19 is robust and more efficacious than vaccine-immunity to COVID-19.

92.     The *EUA* statute, *21 U.S.C. § 360bbb-3*, explicitly provides that anyone to whom an *EUA* product is administered must be presented the option to accept or to refuse it, as well as to be afforded informed consent as to the risks and benefits of receiving the product and potential alternatives to the product.

---

[49] See Requirement of Proof of Negative COVID-19 Test or Recovery from COVID-19 for All Air Passengers Arriving in the United States, CDC (July 6, 2021), available at https://bit.ly/3yfcJDM  (last visited July 28, 2021). Document 11 Filed 10/03/21 Page 443 of 578 PageID 506

93.     It is uncontroverted that near-term side effects of the Pfizer-BioNTech COVID-19 Vaccine include pain, redness, and swelling at the injection site, as well as tiredness, headache, muscle pain, chills, fever, nausea.[50]

94.     Other documented near term side effects include myocarditis, pericarditis, blood clots, and death.[51]

95.     Plaintiff has suffered from pericarditis in the past. Given his age, gender, and experience with pericarditis, Plaintiff is at an elevated risk for heart-related side-effects that are caused by the novel injections.

96.     Serious concerns have been raised about the safety of taking the shots while pregnant or attempting to conceive.

97.     As of October 29, 2021, the FDA-authorized vaccines—Pfizer's BNT162b2, Moderna, and Janssen—have resulted in 634,609 adverse reactions reported in VAERS for the United States, alone.

98.     As of October 29, 2021, the FDA-authorized vaccines—Pfizer's BNT162b2, Moderna, and Janssen—have resulted in the following specific metrics in VAERS for the United States alone: 52,685 serious reactions (including anaphylactic); 38,818 hospitalizations; 9,580 permanent disabilities, and; 8,284 deaths.

99.     A 2003 study by the CDC determined that fewer than 1% of adverse vaccine reactions are ever reported to VAERS.[52]

---

[50] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/expect/after.html#:~:text=Some%20people%20have%20no%20side,of%20receiving%20a%20vaccine%20dose. Document 11 Filed 10/03/21 Page 452 of 578 PageID 515

[51] See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html (Men under 40 years old seem to be at the highest risk for this outcome, see FDA Committee discussion at 6:28-6:30. Document 11 Filed 10/03/21 Page 455 of 578 PageID 518 https://www.youtube.com/watch?v=WFph7-6t34M&t=23379s. See also June 11, 2021, report by CDC) blood clots and death (5,439 reported as of September 19, 2021).

[52] https://abc13.com/pregnant-women-and-covid19-should-get-vaccine-moderna-world-health-organization-data/10051361/ Document 11 Filed 10/03/21 Page 457 of 578 PageID 520

100.    The full extent of near-term side effects is still uncertain, and the risk of long-term side effects is almost entirely unknowable.[53]

101.    Roughly 62 million adults Americans have chosen not to receive an injection. Although Americans of all walks of life may choose to be and wish to remain unvaccinated, there are certain, important demographic tendencies among the unvaccinated.

102.    Straight people are more likely than those identifying as LGBT to be and wish to remain unvaccinated. With respect to "sexual orientation," 82% of LGTB-identifying adults were reported to have received at least one injection, compared to 66% of the general adult population.[54]

103.    Men are more likely than women to be and wish to remain unvaccinated.[55]

104.    Non-Hispanic Whites are more likely than members of other races or ethnicities to be and wish to remain unvaccinated. Among races and ethnicities, according to one poll, Whites are the least likely to have received the injections (66%), as compared to Blacks (76%) and Latinos (71%).[56]

105.    Evangelical White Christians are more likely than other groups to be and wish to remain unvaccinated. [57] [58]

---

[53] See "More Dangerous Side Effects Potentially Linked To mRNA Vaccines, EU Warns," Tyler Durden, August 11, 2021 https://www.zerohedge.com/covid-19/new-side-effects-potentially-linked-mrna-vaccines-eu-warns (last site visit September 24, 2021) Document 11 Filed 10/03/21 Page 459 of 578 PageID 522
[54] See https://www.kff.org/coronavirus-covid-19/poll-finding/views-of-covid-19-vaccines-among-lgbt-adults/ (Appx 45) Document 11 Filed 10/03/21 Page 461 of 578 PageID 524
[55] https://fivethirtyeight.com/features/why-is-there-such-a-gender-gap-in-covid-19-vaccination-rates/ Amd Cpt Appx at 10
[56] Id.
[57] See "Why Some White Evangelical Republicans Are So Opposed To The COVID-19 Vaccine," Natalie Jackson, August 26, 2021 https://fivethirtyeight.com/features/why-some-white-evangelical-republicans-are-so-opposed-to-the-covid-19-vaccine/ (last site visit September 24, 2021). Document 11 Filed 10/03/21 Page 461 of 578 PageID 524
[58] See https://www.nbcnews.com/politics/meet-the-press/nbc-news-poll-shows-demographic-breakdown-vaccinated-u-s-n1277514 Document 20-1 Filed 10/13/21 Page 40 of 182 PageID 821

106.    Catholics who aspire to fulfill the five precepts of the Church[59] are more likely than average Americans to be and wish to remain unvaccinated. [60] [61]

107.    With respect to political orientation, Republicans are more likely than Democrats to be and wish to remain unvaccinated. (86% of Democrats versus 54% of Republicans).[62]

108.    Among Democrats, those who voted for President Biden are more likely to have received the injections (91%).

109.    Among Republicans, those who are least supportive of the party's establishment are more likely to be and wish to remain unvaccinated. Only 46% of those "who support Trump more than party" had received the injections versus 62% of those "who support party more than Trump."[63]

110.    Thus, Straight, White, male, devout followers of Jesus Christ, who are more supportive of Trumpian policies than Republican politics, are the demographic group most at odds with the President and can fairly be described as his political opposition. The President's mandate will bear its greatest negative effects on his political opposition.

111.    Americans who object to the novel mRNA injections have become the favorite scapegoat of the media and Biden administration for all ongoing COVID-19-related problems, despite the

---

[59] For a discussion of the precepts, see https://stpaulcenter.com/what-are-the-precepts-of-the-church/ Document 20-1 Filed 10/13/21 Page 60 of 182 PageID 81 (1.) On Sundays and holy days of obligation, attend Mass and rest from servile labor;  2.) Confess your sins at least once a year; 3.) Receive the Sacrament of the Eucharist at least once during the Easter season;  4.) Observe the days of fasting and abstinence from meat established by the Church; and 5) help provide for the needs of the Church.)(Appx 56) Many polls include "Catholics" who have no intention of meeting these minimum requirements, but who do like to be considered "Catholic" and thus, any poll or measure of "Catholics" is deceptive if taken at face value.

[60] See https://www.ncronline.org/news/coronavirus/poll-reveals-religious-differences-acceptance-covid-19-vaccine (As of August, 5, 2021, only 40% of "white Catholics" had received the injections) Document 20-1 Filed 10/13/21 Page 57 of 182 PageID 838

[61] See e.g Janet Smith, Crisis Magazine, September 27, 2021. https://www.crisismagazine.com/2021/the-fake-theology-behind-vaccine-mandates (Appx 58);Kennedy Hall, September 14, 2021 Document 20-1 Filed 10/13/21 Page 62 of 182 PageID 843 https://www.crisismagazine.com/2021/we-are-all-anti-vaxxers-now; (Appx 70) Phillipe Champlain, August 24, 2021 https://www.churchmilitant.com/news/article/vaccine-mandate-lunacy (Appx 73)

[62]See https://www.usnews.com/news/top-news/articles/2021-09-02/theranos-judge-requires-covid-shots-for-jurors-but-will-that-skew-the-jury-pool; https://www.kff.org/policy-watch/the-red-blue-divide-in-covid-19-vaccination-rates/(Document 20-1 Filed 10/13/21 Page 32 of 182 PageID 813

[63] https://www.nbcnews.com/politics/meet-the-press/nbc-news-poll-shows-demographic-breakdown-vaccinated-u-s-n1277514 Document 20-1 Filed 10/13/21 Page 40 of 182 PageID 821

fact that nations like Israel with much higher COVID-19-vaccination rates continue to have their own recent spikes in COVID-19 case, hospitalizations, and deaths.[64]

112.    Americans who object to the novel injections are being systematically shut out of social and economic life as restrictions have been place on their ability to visit restaurants or entertainment venues, their ability to work and hold professional licenses,[65] and their ability to speak out again the novel mRNA injections on social media.[66]

113.    The President's political goals include increasing the number of citizens who are "fully vaccinated."  The President's first numerical goal (which he failed to achieve) was to get 70% of Americans to be vaccinated by July 4, 2021.[67]

114.    In announcing his mandate on September 9, 2021, President Biden proclaimed, "[w]e have been patient, but our patience is wearing thin, and your refusal has cost all of us. The unvaccinated minority can cause a lot of damage, and they are."[68]

115.    Speaking for the President on the following day, Cedric Richmond, director of the White House Office of Public Engagement, addressed those who object to undergoing the novel mRNA injection, claiming that it is:

> "unfortunate that we have so many governors that are using vaccinations and mask requirements as a political gain. But our purpose is to save lives, and we will do anything and everything under our control to make sure that we protect our citizens, especially those children who cannot get a vaccination yet. And so, we have to do everything we

---

[64] *Evaluation of a Booster Dose (Third Dose),* VRBPAC Briefing Document submitted to the Vaccines and Related Biological Products Advisory Committee for its September 17, 2021 meeting, page 6. https://www.fda.gov/media/152161/download Document 11 Filed 10/03/21 Page 55 of 578 PageID 118

[65] See e.g. https://www.healthleadersmedia.com/clinical-care/physicians-face-disciplinary-action-coronavirus-vaccine-misinformation (last checked September 28, 20210) Document 11 Filed 10/03/21 Page 465 of 578 PageID 528

[66] https://www.wsj.com/articles/biden-blasts-covid-19-vaccine-misinformation-on-social-media-11626464163 (noting that Facebook has removed millions of posts and deplatformed an untold number of users for posting facts contrary to the accepted narrative) Document 11 Filed 10/03/21 Page 468 of 578 PageID 531

[67] https://www.nbcnews.com/politics/white-house/graphic-track-biden-fourth-july-vaccination-goals-n1268803

[68] See https://www.dallasnews.com/news/2021/09/10/some-north-texans-see-tyranny-in-bidens-vaccine-mandate-others-say-it-affirms-belief-in-shots/ (last visit September 26, 2021) Document 11 Filed 10/03/21 Page 471 of 578 PageID 534

can to make sure adults do it. And those governors that stand in the way, I think it was very clear from the president's tone today that <u>he will run over them</u>."[69]

116. On July 29, 2021, President Biden issued a public statement in which he proclaimed that, "every federal government employee will be asked to attest to their vaccination status." The President went on to state that employees who do "not attest or [are] not vaccinated will be required to mask no matter where they work; test one or two times a week to see if they have a — they have acquired COVID; socially distance; and generally will not be allowed to travel for work."[70]

117. On September 9, 2021, President Biden, invoking the authority vested in him "as President by the Constitution [generally] and the laws of the United States of America, including sections *3301*,[71] *3302*,[72] and *7301*,[73] of *Title 5, United States Code*" issued Executive Order No. 14043, "*Executive Order on Requiring Coronavirus Disease 2019 Vaccination for federal Employees*." (the Order)

118. In the Order, President Biden stated that it was his policy to "halt the spread of coronavirus disease 2019 (COVID-19), including the B.1.617.2 (Delta) variant, by relying on the best available data and science-based public health measures," and that the CDC "has determined that the best way to slow the spread of COVID-19 and to prevent infection by the Delta variant or other variants

---

[69] See "Shots fired: Biden adviser vows Joe will 'run over' govs opposed to vax mandate," Samuel Chamberlain, New York Post, September 10, 2021 https://nypost.com/2021/09/10/adviser-vows-biden-will-run-over-govs-opposed-to-vaccine-mandate/ (last visited September 24, 2021) Document 11 Filed 10/03/21 Page 482 of 578 PageID 545

[70] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/07/29/remarks-by-president-biden-laying-out-the-next-steps-in-our-effort-to-get-more-americans-vaccinated-and-combat-the-spread-of-the-delta-variant/ Document 11 Filed 10/03/21 Page 537 of 578 PageID 600

[71] The President may—(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service; (2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought; and (3) appoint and prescribe the duties of individuals to make inquiries for the purpose of this section.

[72] The President may prescribe rules governing the competitive service. The rules shall provide, as nearly as conditions of good administration warrant, for—(1) necessary exceptions of positions from the competitive service; and (2) necessary exceptions from the provisions of sections 2951, 3304(a), 3321, 7202, and 7203 of this title. Each officer and individual employed in an agency to which the rules apply shall aid in carrying out the rules.

[73] The President may prescribe regulations for the conduct of employees in the executive branch.

is to be vaccinated." The President stated that, "[i]t is essential that federal employees take all available steps to protect themselves and avoid spreading COVID-19 to their co-workers and members of the public," and so he found that "it is necessary to require COVID-19 vaccination for all federal employees, subject to such exceptions as required by law." He ordered each agency to take steps towards ensuring universal vaccination (except as required by law) and directed the Safer Federal Workforce Task Force ("Task Force") to issue guidance within 7 days of the date of this order on agency implementation of this requirement for all agencies covered by this order.

119.   On September 16, 2021, the Task Force issued "guidance" whereby it imposed a deadline of November 22, 2021, for all covered federal employees to become "fully vaccinated." The Task Force instructed that, depending on which vaccine federal workers elected, the first vaccine shot would need to be administered by October 11, 2021, and the second dose no later than November 8, 2021.[74]

120.   The Task Force directed federal agencies to "encourage employees to plan ahead and allow enough time to receive all required vaccine doses before the November 8 deadline to have their second shot."

121.   The Order requires all unvaccinated federal employees to take a "vaccine" regardless of whether:

> i. they can demonstrate natural immunity from a prior COVID-19 infection;[75]
> ii. they possess genes associated with natural immunity to a COVID-19 infection;
> iii. their doctors advise them, based on their unique medical circumstances, that the risks of side effects outweigh the benefits of receiving the vaccine;
> iv. they are pregnant;
> v. they are attempting to or hope to become pregnant;

---

[74] https://www.saferfederalworkforce.gov/faq/vaccinations/
[75] See *Costen v. Biden*, Case 1:21-cv-02484, U.S. District Court of Columbia, filed September 23, 2021, where plaintiffs demonstrate that they are subject to the Order despite proof of natural immunity.

      vi.   they work entirely from their homes, or;

     vii.   they rarely encounter coworkers or members of the public.

122.    Exemptions from the mandate are vaguely referred to as "by law" and, as designated by the Task Force, include only those that may be established through proof of a disability under the *Rehabilitation Act or Americans with Disability Act* ("*ADA*") or a deeply held religious belief under *Title VII of the Civil Right Act*. According to the Task Force:

> "federal employees must be fully vaccinated other than in limited circumstances where the law requires an exception. In particular, an agency may be required to provide a reasonable accommodation to employees who communicate to the agency that they are not vaccinated against COVID-19 because of a disability or because of a sincerely held religious belief, practice, or observance. Determining whether an exception is legally required will include consideration of factors such as the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations, including protecting other agency employees and the public from COVID-19. Because such assessments will be fact- and context-dependent, agencies are encouraged to consult their offices of general counsel with questions related to assessing and implementing any such requested accommodations. Additional guidance on legally required exceptions will be forthcoming."[76]

123.    The Order and the guidance issued thus far provides no alternative to discipline and discharge for those employees who choose not to inject the novel mRNA "vaccine" unless those employees can establish an exemption via disability status or sincerely held religious belief.

124.    The SFTW's guidance provides only the possibility of delay if they react adversely to the first of an injection series. For instance, even if an employee develops myocarditis after the first shot, he is nonetheless required to undergo a second injection to be considered "fully vaccinated" and must do so once his symptoms have subsided.[77]

---

[76] https://www.saferfederalworkforce.gov/faq/vaccinations/ (last visit September 24, 2021)

[77] See https://www.saferfederalworkforce.gov/faq/vaccinations/ (last reviewed October 13, 2021)(" Q: Are there circumstances that the CDC recommends delaying vaccination for COVID-19? A: Yes. In the following circumstances, the CDC recommends delaying vaccination for COVID-19 for adults: People who develop myocarditis or pericarditis after a dose of an mRNA COVID-19 vaccine should delay receiving a subsequent dose. People who choose to receive a subsequent dose should wait until myocarditis has completely resolved.") Document 20-1 Filed 10/13/21 Page 94 of 182 PageID 875

125.    The Order contemplates no time in the future at which point "full vaccination" will no longer be required even though the first employees who were fully vaccinated in March 2021 already have little, if any, enhanced protection, and, by March 2022 may have no "vaccine" durability at all.

126.    The Office of Management and Personnel (OPM), and individual agencies, are authorized to establish and/or approve medical standards for a Governmentwide occupations.[78]

127.    Under normal regulations, medical standards, "must be justified on the basis that the duties of the positions are arduous or hazardous, or require a certain level of health status for successful performance when the nature of the positions involves a high degree of responsibility toward the public or sensitive national security concerns. The rationale for establishing the standard must be documented and supported by a study(ies) or evaluation(s) establishing the medical standard is job-related to the occupation(s)." *Id.*

128.    Under the regulations, the Government has authority to require vaccinations, but only if for those "whose work may expose them or others to significant health or safety risks due to occupational or environmental exposure or demands."[79]

129.    Even when the Government determines that immunity to a particular disease is necessary due to the dangers imposed by a certain staffing position, if an employee can prove immunity through previous exposure, the vaccination will generally not be required. For example, the Coast Guard Medical Manual, discusses the following at COMDTINST M6000.1F[80]:

> "Measles, Mumps, and Rubella. Administer MMR vaccine to all AD and SELRES CG personnel born after 1957 (including accessions). Ensure they have received two lifetime doses of MMR vaccine **or have positive serologic test results**. Unless there is reason to suspect otherwise (e.g. childhood spent in a developing country, childhood

---

[78] 5 CFR § 339.202 - Medical standards.
[79] See 5 CFR § 339.205 - Medical evaluation programs.
[80] Available at COAST GUARD MEDICAL MANUAL, COMDTINST M6000.1F (defense.gov) Document 11 Filed 10/03/21 Page 567 of 578 PageID 630

immunizations not administered), a childhood dose of MMR vaccine may be assumed. Proof of immunity via serology testing or prior history of completed vaccination series (per medical documentation) will be accepted. Document immunization or results of proof of immunity in MRRS. For personnel whose records show receipt of bivalent measles-rubella vaccine, administration of MMR vaccine to achieve immunity against mumps is not necessary as a military requirement, but may be appropriate in exceptional clinical circumstances."

130.    On September 9, 2021, President Biden laid out his "COVID Action Plan," which included an announcement that he had directed the Occupational and Safety Hazards Agency (OSHA) to require employees with 99 or more coworkers to either take the injections or take frequent tests for the COVID infection.[81]

131.    At all times, the SFWTF has communicated to the public only through an opaquely administered website in which a user can only access and view certain sections at one time.  The SFWTF does publish its guidance in the Federal Register.

132.    On October 5, 2021, the Director of OPM, a co-chair on the Task Force, issued a memorandum to all Executive Branch department heads and agency heads, directing that progressive disciplinary action may commence against unvaccinated employees as early as November 9, 2021.

133.    The Task Force is an Agency for Purposes of the *APA*.

134.    On September 13, 16, 24, and 30, 2021, and October 1, 4, 21, and 29, 2021, and November 1 and 10, 2021, the Task Force issued numerous implementing rules to enforce the edit of Executive Order Nos. 14402 and 14043, which it posted on its website.

135.    The CDC is a creature of the Executive Branch which wades into the issues of the day in support of the President's political goals. For instance, the CDC issued an eviction moratorium to

---

[81] https://www.documentcloud.org/documents/21060169-biden-covid-action-plan Document 11 Filed 10/03/21 Page 536 of 578 PageID 599

help the economically distressed.[82] The CDC is also battling the "twin epidemics of COVID-19 and racism."[83] Meanwhile, the CDC is not afraid to wade into the realm of education where it advocates for the "inclusion of LGBT-related topics in sex education curricula."[84] Nor does the CDC leave the myriad issues surrounding man-made climate issues to the EPA.[85] In short, the CDC serves as the mouthpiece for the reigning political regime and cannot be expected to do otherwise. To the extent that Defendants rely on the CDC as authority, such authority should not be taken at face value.

136.    The FDA has historically been more insulated from politics, but the political goals associated with the vaccine policy have already exerted considerable pressure there. As reported by Politico[86]:

> On [August 31, 2021], two top FDA vaccine regulators resigned — a decision that one former official said was rooted in anger over the agency's lack of autonomy in the booster planning so far. A current health official said the pair, Marion Gruber and Philip Krause, left over differences with FDA's top vaccine official Peter Marks. Now the agency is facing a potential mutiny among its staff and outside vaccine advisers, several of whom feel cut out of key decisions and who view the plan to offer boosters to all adults as premature and unnecessary.
>
> POLITICO spoke to 11 current and former health officials and people familiar with the matter who described growing exasperation with the administration's disjointed process for implementing its booster plan. Those sources said there is little coordination between federal health agencies, even as two top FDA officials try to guide the rollout.
>
> "We understand the importance of additional vaccine doses for control of this pandemic and will move as rapidly as possible to evaluate all submissions. Responding to this pandemic requires an all of government approach," an FDA spokesperson told POLITICO. "FDA has and will continue to make regulatory decisions. And the [Centers

---

[82] https://www.cdc.gov/media/releases/2021/s0803-cdc-eviction-order.html  Document 11 Filed 10/03/21 Page 547 of 578 PageID 610

[83] https://www.cdc.gov/healthequity/racism-disparities/expert-perspectives/gayle/index.html

[84] https://www.cdc.gov/lgbthealth/youth-programs.htm

[85] https://www.cdc.gov/climateandhealth/default.htm

[86] https://www.politico.com/news/2021/08/31/biden-booster-plan-fda-508149

for Disease Control and Prevention's vaccine advisory committee] will continue to make clinical recommendations."

137. While top-down politic-over-medical process tactics have roiled the upper ranks of the FDA, the Order will doubtlessly push dissident thinkers throughout the agency either out the door or into silence.

138. The Merit Systems Protection Board is led by three presidentially-appointed board members. The President may remove those members for inefficiency, neglect of duty, or malfeasance in office. The Board operates concurrently with the Office of Special Counsel, an "independent," prosecutorial federal agency, the head of which may also be removed for "inefficiency, neglect of duty, or malfeasance in office."

139. Plaintiff David A. Foley has been employed by the NLRB continuously since September 2009. He was appointed as the Regional Attorney for the 16th Regional Office of the NLRB on June 28, 2021.

140. Plaintiff's position description contains no references to taking vaccinations or providing medical advice to employees. In his work at the NLRB, Plaintiff has never given medical advice or disciplined employees for matters related to their personal health.

141. Plaintiff's duties include assisting the NLRB in carrying out its mission and goals, which include effectuating compliance with Executive Orders.

142. As Regional Attorney, Plaintiff has managerial responsibility for roughly 25 employees. He is responsible for ensuring their compliance with agency directives and may be involved in issuing discipline.

143. Plaintiff preferred not to disclose, and prefers to disclose no further, to his employer personal and private information about: vaccination status; religious beliefs; political beliefs; genetic data; or medical history.

38

144.    Plaintiff believes that a) for many people, taking one of these novel COVID-19 injections is not medically prudent, b) the novel injections are tarnished by the moral stain of being the product of aborted children, c) the injection mandates are evil.

145.    Plaintiff cannot, in good conscience, "encourage" any employees to take any of the available COVID-19 injections at any time and cannot, in good conscience, be involved in disciplining those who refuse.

146.    There is no evidence that Plaintiff, who has been teleworking for more than a year, has contributed to COVID-19 transmissions at a rate higher than vaccinated employees in the federal workplace.    There is little, if no, evidence that there is any difference between COVID-19 transmission rates, regardless of vaccination status, per the CDC's own documented findings.[87]

147.    Plaintiff is a member of the Catholic Church, an officer of his local Knights of Columbus council, a leader in another fraternal Catholic organization.

148.    Pope Francis is the visible Head of the Church.

149.    Although no under an official, infallible, pronouncement of doctrine regarding faith and morals in support the injections, Pope Francis has publicly supported the injections. As such, conscientious Catholics may reach their own beliefs as to the morality of the injections.

150.    For a variety of reasons, including that the injections were derived through cells of murdered children, Plaintiff holds the sincere belief that the injections are evil and that he would sin by receiving them or materially supporting efforts to coerce others into receiving them.

151.    Although Catholics are free to disagree with Church leaders on a range of religious issues, when they do so publicly, they must do so with discretion being mindful that detraction from unity

---

[87] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html. Document 11 Filed 10/03/21 Page 23 of 578 PageID 86

39

in the Church can involve the sin of schism. As such, Plaintiff prefers to keep the full scope of his beliefs with respect to his injections as a private and largely internal matter.

152.    On October 8, 2021, roughly 200 high-level officials from various agencies met with White House Advisor Samuel Berger, who provided them with guidance about the mandate rollout process.[88] Evidence regarding this meeting may have bearing on the Defendants' intentions with respect to providing employees with information about exceptions, the exceptions process, and what types of goals Defendants may have had with respect to issuing exception and accommodations.

153.    On October 8, 2021, NLRB Deputy General Counsel Peter Ohr sent an email to all NLRB staff in which he wrote that all NLBR employees must be "fully vaccinated" by November 22, 2021, and that if they wished to "seek a legal exception to the vaccine requirement as an accommodation due to a disability or because of a sincerely held religious belief, practice, or observance," they should fill out forms that were attached to the email an submit their requests by October 15, 2021. The forms attached to the email were identical to those that the SFWTF had recently posted on its website.

154.    The religious exception reform consisted of one page and stated as follows:

> "Government-wide policy requires all Federal employees as defined in 5 U.S.C. § 2105 to be vaccinated against COVID-19, with exceptions only as required by law. In certain circumstances, Federal law may entitle a Federal employee who has a religious objection to the COVID-19 vaccination requirement to an exception from that requirement, in which case the employee would instead comply with alternative health and safety protocols. The Federal Government is committed to respecting the important legal protections for religious liberty. The purpose of this form is to determine whether you may be eligible for an exception. To be eligible for a possible exception, you must first establish that your refusal to be vaccinated is based upon a sincere belief that is religious in nature. A refusal to be vaccinated does not qualify for an exception if it is based upon personal preference, concerns about the possible effects of the vaccine, or political opinions.

---

[88] See *Church v. Biden*, filed October 24, 2021 (D.C.) 1:21-cv-02815; Document 1 Filed 10/24/21 Page 25-26 of 99

In order to request a religious exception, please fill out this form. The agency may ask for other information as needed to determine if you are legally entitled to an exception. Signing this form constitutes a declaration that the information you provide is, to the best of your knowledge and ability, true and correct. Any intentional misrepresentation to the Federal Government may result in legal consequences, including termination or removal from Federal Service.

QUESTIONS:
1. Please describe the nature of your objection to the COVID-19 vaccination requirement.
2. Would complying with the COVID-19 vaccination requirement substantially burden your religious
exercise? If so, please explain how.
3. How long have you held the religious belief underlying your objection?
4. Please describe whether, as an adult, you have received any vaccines against any other diseases
(such as a flu vaccine or a tetanus vaccine) and, if so, what vaccine you most recently received and
when, to the best of your recollection.
5. If you do not have a religious objection to the use of all vaccines, please explain why your objection
is limited to particular vaccines.
6. If there are any other medicines or products that you do not use because of the religious belief
underlying your objection, please identify them.
7. Please provide any additional information that you think may be helpful in reviewing your request"

155.    On October 14, 2021, NLRB Deputy General Counsel Peter Ohr discussed the exception process with NLBR managers.  Notes of the meeting were disseminated to Plaintiff. As Plaintiff understands the notes, during that meeting, either Ohr communicated that there were "big if's" (it is unclear whether Ohr used this phrase or whether this was the notetaker's impression) as to whether very many employees would receive exceptions, and if so, whether they would be accommodated as it was uncertain whether there would be any safe/acceptable way to accommodate them.

156.    On October 15, 2021, Plaintiff responded to Deputy General Counsel Ohr's October 8, 2021 email by sending an email addressed to President Biden (via counsel to this proceeding), the SFWTF and various agents of the NLRB. In his email, Plaintiff wrote as follows:

41

"Dear President Biden, Members of the Safer Federal Workforce Task Force, and all,

This is a response to the email that was sent just last Friday from the NLRB COVID-19 Task Force.  That email requires me to submit certain forms by today in order to be eligible for exception to the reception of an unwanted, experimental medical product.  Although the form was ostensibly sent from the NLRB, it is clear that decisions on whether exceptions will be granted and more importantly, whether they will be accommodated, are coming from the top. For that reason, I have included NLRB personnel but am directing this email to the President and his SFWTF.

### *Medical Form*

1.      I have read the attached medical exception form. The form is to be filled out and submitted if:

a.              I have a disability that would indefinitely prevent me from receiving one of the  Emergency Use Authorization only COVID-19 immunity products, or

b.              I have a temporary medical condition which President Biden's Safer Federal Workforce Task Force (SFWTF) has determined is sufficient grounds for delaying receptions of an EUA product.

2.      My belief with respect to the medical risks of taking one of these EUA products, and any medical support for that belief are irrelevant to these questions where,

a.              I am not aware of any "disabilities" that I may have, and

b.              I am not aware of any temporary medical conditions that might qualify me for receiving the EUA products at some later time.

3.      Based on the above, I am not applying for a medical exception.

4.      If, in light of the above, you are aware of any other circumstances where the insights of a doctor would qualify me for a medical exception, I request that you:

a.              Explain what those circumstances are,

b.              Provide me with an extension of time to answer this questionnaire,

c.              Provide me with reasonable amounts of Administrative Leave which I may use for the purpose of seeking out the advice of medical experts, and

d.              Provide me with reasonable amounts of Administrative Leave which I may use for seeking legal counsel.

### *Religious Request Form*

5.      I have read the attached religious request form.

6.      The words of Saint Benedict are appropriate here, when he said,

*Vade      Retro Satana! Numquam Suade Mihi      Vana!      Sunt      Mala Quae Libas. Ipse venena bibas!*

*Begone Satan! Never tempt me with your vanities! What you offer me is evil! Drink the poison yourself!*

7.      I believe that

a.          Receiving the abortion-derived EUA products would constitute a substantial burden on my religious exercise, and

b.          Where the head of my church has publicly taken a position in favor of the EUA products, my explanations as to my religious beliefs that run contrary the Pope (especially once they are subjected to the interrogation of a governmental Sanhedrin) could run me in risk of the mortal sin of *schism*. It is clear that these mandates, whatever their intentions, are indeed pushing pressure against fault lines and creating division and schism [within] the [Church]. As such, <u>answering your questions</u> represents a substantial burden on my religious exercise and I decline to answer further except as follows,

c.          Question 6

*Question*: "If there are any other medicines or products that you do not use because of the religious belief underlying your objection, please identify them."

*Answer*: I reject and will not provide material support to the following <u>and, as a Catholic, I encourage you to do the same.</u>

Any medical product which

a.) interferes with creation of life ("birth control"),

b.) causes the destruction of life (chemical abortion "products" and assisted suicide "products"),

c.) any medical product which is used to reverse the physical expression of "gender" (chemical sexual reassignment "products"),

and (d) those medical products which are derived from the destruction of life (these "vaccines" among them)

*Suggestion*: Join me in rejecting these poisons. Tell Satan to drink the poison himself. It is never too late.

8.          When I came to these beliefs or what other vaccines I have taken or how many times and in what manner I have sinned is between me and God.

9.          If my answers in No. 6 are insufficient for your inquiry, I ask that you

a.          Provide your explanation as to why they are insufficient,

b.          Provide me with an extension of time to answer this questionnaire,

c.          Provide me with reasonable amounts of Administrative Leave which I may use for the purpose of seeking the counsel of my clergy, and

d.          Provide me with reasonable amounts of Administrative Leave which I may use for the purpose of seeking the legal counsel.

### *Coercion to use an Emergency Use Authorized Product*

10.          If you are aware of a clinic in my area that can provide me with Comirnaty, I ask that you provide me the location of that clinic.

### *A Wicked and Cruel Exercise*

11.          It is my (nonreligious belief) that this whole inquiry is essentially a demeaning and cruel exercise where no matter how much groveling they do, very few employees will be granted an exception and roughly zero employees will be accommodated in a manner that involves them retaining their jobs.

12.        If you have any concrete guidance as to the idea of an accommodation being something that is possible for employees, please provide me with that assurance. If there is not really any chance of accommodation, please stop this demeaning inquiry.

***Incorporation of my Complaint***

13.        As you area aware, I have filed a Complaint in federal court, seeking relief against the Executive Order that is now causing us to have this interaction. I attach and hereby incorporate all statements and arguments that I made in my Complaint and recent Response.

I pray that your heart will soften and that your eyes will open to the wickedness that are you doing with this mandate.

Yours truly,

David A. Foley"

157.    On October 18, 2021, Deputy General Counsel Ohr sent another email to all staff in which he reminded them about the mandate deadlines and encouraged the NLRB's own COVID-19 taskforce if they had questions about the "vaccines."

158.    On October 19, 2021, Plaintiff sent an email to the NLRB's COVID-19 taskforce in which he presented a link to a PowerPoint presentation which raises serious questions about the safety and effectiveness of the "vaccines" and in the same email, he requested sources of information which might counter the specific points raised in those slides.

159.    On October 21, 2021, an identified agent of the SFWTF responded to Plaintiff's October 15, 2021 email by providing links to the SFWTF and White House websites and directing Plaintiff to contact his agency with questions.

160.    As of October 25, 2021, Plaintiff had roughly 200 hours of annual leave and 616 hours of sick leave. Upon separation, an employee's annual leave is converted to a cash payment, while his sick leave is forfeited.[89]

---

[89] Sick leave is restored to an employee if that employee returns to the federal workforce.

161.    Under *5 CFR § 630.401* - Granting sick leave, "an agency must grant sick leave to an employee when he or she…[w]ould, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by his or her presence on the job because of exposure to a communicable disease."

162.    Given that the Defendant issued the Order for the purported reason that the unvaccinated jeopardize the health of others because of the risk of exposure to a communicable disease, on October 25, Plaintiff requested to begin using 616 hours of leave of sick leave on November 22 (the "vaccination" deadline) and ending on March 14, 2022.

163.    On October 26, 2021, a member of the NLRB's COVID-19 taskforce responded to Plaintiff's October 15 email by informing him that the email would be treated as a request for a religious exception request and informing him that the NLRB had no further information in response to his email.

164.    On the afternoon of Friday October 29, 2021, without announcement, the SFWTF replaced the religious request form on its website.[90] Neither the SFWTF, OPM, nor the NLRB announced that the form had been changed.

165.    On November 10, 2021, an agent of the National Labor Relations Board denied Plaintiff's sick leave request on the grounds that he had failed to provide documentation sufficient to establish that he posed a threat of exposure to a communicable disease. Plaintiff responded the same day, explaining that it is the *Administration's* position that he poses a risk of exposure of commutable disease.

166.    The Order, together with similar mandates imposed on the military, federal contractors and federal sub-contractors, as well an OSHA rule which requires injection or testing for all employees

---

[90] See https://thefederalist.com/2021/11/01/administration-backtracks-on-questionnaire-for-religious-exemptions-to-covid-19-vaccine-mandate/

with 99 coworkers represents the most controversial medical mandate in the history of the Republic.

167.    The Order, together with similar mandates imposed on the military, federal contractors and federal sub-contractors, as well an OSHA rule also represents the most controversial unilateral action by the Federal Executive Branch in modern history.

168.    Including the instant case, seven cases so far have been brought in federal district courts challenging the Order.[91]

169.    No legislature, state or federal, has passed a law requiring novel COVID-19 injections. To the contrary, where legislative bodies have acted, they have acted to restrict injection mandates.[92] Including executive actions by governors, 12 states thus far, including Texas, have taken actions that limit government or corporate authority to mandate injections.[93]

170.    Attorneys general in a majority of states (27) have filed suit against the federal Government over some aspects of the federal mandates.[94]

---

[91]See Brnovich v. Biden, filed by Attorney General of Arizona, on 9-14, No. 21-1568 (D. Ariz); GREGG COSTIN, et al. v. Biden filed by Michael Yoder on 9-23 (D.C.), 1:21-cv-02484; Foley v. Biden, filed by David Foley and Daniel Flickinger on 9-29 (Northern District of Texas) 4:21-cv-01098-O, Navy Seal, et al v. Biden filed by Liberty Counsel on 10-15 (Middle District of Florida) 8:21-cv-02429; ALTSCHULD ET AL v. RAIMONDO et al (D.C.) filed by the Federal Practice Group on 10-19, 1:2021cv02779; Employee A v. Biden, filed by Jonathan Bolls on October 19, 2021 (Maryland) 8:2021cv02696, see motion for TRO; Church v. Biden, filed by Michael Yoder on 10-24 (D.C.)1:21-cv-02815, James Joseph Rodden, et al. v. Dr. Anthony Fauci, et al. filed by John J. Vecchione, Jenin Younes, and Harriet Hageman of New Civil Liberties Alliance and Robert Henneke of Texas Public Policy Foundation on November 5, 2021 (Southern District of Texas) 3:21-cv-00317

[92] See https://www.beckershospitalreview.com/workforce/11-states-banning-covid-19-vaccine-mandates-how-it-affects-healthcare-workers.html (last visited on September 26, 2021)("Indiana: On April 29, Republican Gov. Eric Holcomb signed a law prohibiting state or local governments from requiring anyone, including employees, to show proof of vaccination… Montana: On May 7, Republican Gov. Greg Gianforte signed a bill that prohibits discrimination based on vaccination status… New Hampshire: On July 26, Republican Gov. Chris Sununu signed a bill stating that employers may only mandate immunization as a condition of employment when a "direct threat" exists…North Dakota: On May 7, Republican Gov. Doug Burgum signed a bill prohibiting state government entities from requiring a private business to obtain documentation to verify an individual's vaccination status… Tennessee: On May 25, Republican Gov. Bill Lee signed a bill that prohibits a state agency, department or political subdivision from mandating COVID-19 vaccines… Utah: On March 16, Republican Gov. Spencer Cox signed a bill that prohibits state agencies from requiring people to get a COVID-19 vaccine as a condition of employment.) Document 11 Filed 10/03/21 Page 26 of 578 PageID 89

[93] Id.

[94] https://abcnews.go.com/Health/wireStory/11-states-file-suit-bidens-business-vaccine-mandate-80989771

**FIRST CLAIM FOR RELIEF:**
**DECLARATORY RELIEF FOR FIRST AMENDMENT RIGHTS**
**(COMPELLED SPEECH)**

171.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

172.    When a public employee's speech relates to matters of public concern, government employers must give the employee leeway when speaking about it, even when the speech is at work. See *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (emphasizing the importance of balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.")

173.    In *West Virginia State Board of Education v. Barnette* 319 U.S. 624 (1943), and later in *Wooley v. Maynard*, 430 U.S. 705 (1977), the United States Supreme Court recognized that the First Amendment also protects a "concomitant" negative free speech right – the right not to speak: "The right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all." Compelled speech can violate the First Amendment as surely as can a restraint on speech – for example, a school may not require a student to salute a flag or to say the Pledge of Allegiance. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."). *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (observing that "[i]f there is any fixed star in our constitutional constellation, it is that

no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein").

174.    The Order, as expounded upon by the Task Force "guidance," impermissibly compels Plaintiff to encourage others to take novel mRNA injections despite their beliefs, religious or otherwise, about the prudence and morality of injecting novel COVID-19 "vaccines."

175.    Accordingly, Plaintiff moves this Honorable Court for an Order declaring President Biden's Executive Order 14043 unconstitutional pursuant to the First Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT OF 1993

176.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

177.    The *Religious Freedom Restoration Act* (*RFRA*) provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." *42 U.S.C. § 2000bb-1(a)*.

178.    The *RFRA* also demands that, should the government substantially burden a person's free exercise of religion, it bears the burden of demonstrating that its burden on religious exercise furthers a compelling government interest and is the least restrictive means of achieving that compelling government interest. *42 U.S.C. § 2000bb-1(b)*. 215. The *RFRA* plainly applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." *42 U.S.C. § 2000bb-2(1)*.

179.    Congress enacted the *RFRA* "to provide very broad protection for religious liberty," going "far beyond what [the Supreme Court] has held is constitutionally required" under the First

Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 706 (2014) (emphasis added). As such, *RFRA* encompasses a very broad definition of "exercise of religion," which includes "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Hobby Lobby*, 573 U.S. at 696 (quoting *42 U.S.C. § 2000bb—5(7)(A)*). The *RFRA* mandated that the law "'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 573 U.S. at 696 (quoting *42 U.S.C. § 2000cc—3(g)*). "*RFRA* operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020).

180. Plaintiff has sincerely held religious beliefs which compel him to refrain from receiving the injections and to refrain from providing a full explanation as to those beliefs to a secular committee of federal government managers.

181. Defendants knew that thousands of federal employees would object to the injections on religious grounds and yet Defendants imposed the mandate anyway. Employees who are forced to provide government officials with answer to questions about the nature of their religious beliefs are burdened regardless of whether they receive an exception.

182. Defendant cannot establish that this requirement was enacted in "furtherance of a compelling government interest."

183. Defendants cannot establish mandatory vaccinations as the default policy are the least restrictive way of achieving any government interest.

184. Defendants cannot establish that there is a compelling government interest in asking employees the seven template questions about their beliefs.

185.    Defendants cannot establish that asking employees the seven template questions about their beliefs was the least restrictive means to achieve their interests.

186.    The least restrictive way to determine whether employees are eligible for a religious exception would be to ask them one question: "Do you have a sincere religious belief that prevents you from taking the injections?" Instead, Defendants seek to set up governmental Sanhedrin which judge the faith of those who profess it.

187.    Worse, Defendants have lured thousands of employees into baring their souls before them without so much as letting them know whether accommodations were genuinely on the table. Thus, Defendant has recklessly burdened the religious practice of thousands of federal employees.

188.    For Plaintiff, Defendant has set up an especially burdensome snare, setting him up to argue religion against the leaders of his church. Was it necessary? Plaintiff filed his original Complaint in this matter on September 29, 2021. Defendants should have noted that Plaintiff had a religious objection and promptly informed him that he was excepted. Instead, they sought to draw from him evidence of his religious beliefs that they might be able to use it as secular evidence against him. No, this was not the least restrictive means.

## THIRD CLAIM:
## VIOLATIONS OF THE ADMINISTRATIVE PROCEDURES ACT ("APA")

189.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

190.    The *Administrative Procedures Act* (*APA*) requires a federal agency to provide notice of its rulemaking and, ordinarily, a thirty-day public comment period prior to enacting, changing, or rescinding a substantive rule.

191.    The notice-and-comment requirement serves the public interest by providing a forum for the robust debate of competing and frequently complicates policy considerations.

192.    An "Agency" for purposes of the *APA* is each authority of the government of the United States, but does not include the legislature, the judiciary, military commissions, courts martial, the municipal government of the District of Columbia, nor the governments of the U.S. territories and possessions.

193.    The President of the United States is not an "Agency" for purposes of the *APA*.

194.    The President of the United States is subject to the notice-and-comment requirement only where a specific statute expressly requires it.

195.    Sections *3301*, *3302*, and *7301*, of Title 5, United States Code (cited by Executive Order No. 14043) does not impose a notice-and-comment requirement on the President of the United States.

196.    The President of the United States can, by Executive Order, govern federal public sector labor practices.

197.    Federal agencies are required to follow the requirements of the *APA*, even when implementing the directive issued by the President of the United States in an Executive Order.

198.    Rules that fall outside the *APA*'s publication requirement include: military functions, agency organization and management, interpretive rules, and internal housekeeping matters.

199.    The Task Force's rulemaking guidance does not involve military functions, agency organization and management, interpretive rules, or internal housekeeping matters.

200.    The Task Force established a vaccination deadline for federal employees of November 22, 2021.

201.    The APA's 30-day comment period can be bypassed if an Agency establishes good cause.

202.    Good cause is established where notice-and-comment are impractical, unnecessary, or contrary to the public interest.

203. Where an Agency believe it has good cause to bypass the public comment period, it must publish the final rule in the Federal Register along with an explanation of the "good cause" the Agency believe justified foreclosing public comment.

204. The mere existence of a deadline, without more, if insufficient to justify invoking the "good cause" exception.

205. The Task Force has never published any of its rulemaking "guidance" in the Federal Register.

206. An unpublished rule may be enforced when the "persons subject thereto are named" (that is, they are personally named) in the rule *and* the persons are either (i) personally served or (ii) have actual knowledge of the rule.

207. Agencies cannot satisfy the "persons subject thereto are named" requirement by generically describing the class of persons.

208. "Internet publication" on an Agency website is not an acceptable alternative to publishing a rule in the Federal Register.

209. "Internet publication" on an Agency website does not create actual knowledge.

210. An Agency action is "final" for purposes of the APA when the rule it decides upon marks the consummation of the Agency's decision-making and either (i) creates rights or obligations, or (ii) legal consequences will result therefrom.

211. Pre-publication action is an official action for purposes of identifying when an agency order was issued for such that a challenge can properly be initiated.

212. An Agency decision is arbitrary and capricious under the *APA* when it fails to consider an important aspect of the problem, offers an explanation that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

213. The *APA* requires an Agency to engage in reasoned decision making and to satisfactorily explain its actions.

214. An Agency cannot offer post hoc explanations for its decision making.

215. The Task Force engages in activity outside the bounds of the *APA*.

216. On October 5, 2021, the Director of OPM, a co-chair on the Task Force, issued a memorandum to all Executive Branch department heads and agency heads, directing that progressive disciplinary action may commence against unvaccinated employees as early as November 9, 2021.

217. The Task Force is an Agency for Purposes of the *APA*.

218. On September 13, 16, 24, and 30, 2021, and October 1, 4, 21, and 29, 2021, and November 1 and 10, 2021, the Task Force issued numerous implementing rules to enforce the edit of Executive Order Nos. 14402 and 144043, which it posted on its website.

219. Good cause does not exist to excuse the Task Force from the *APA*-required notice-and-comment.

220. If good cause does exist, the Task Force has never published any of its rulemaking guidance in the Federal Register.

221. The Task Force continually posts its rulemaking guidance on its website, rather than in the Federal Register.

222. The Task Force has never named a single, individual federal employee in any of its postings to its website.

223. The November 22, 2021 Deadline is arbitrary and capricious.

224. Executive Order No. 14043 does not establish a compliance deadline for vaccination by federal employees.

225.    The CDC has never identified a date-certain by which federal employees should be vaccinated.

226.    The Task Force established the November 22, 2021 vaccination deadline for federal civilian employees.

227.    The Task Force did not explain how it selected the November 22, 2021 deadline.

228.    The Task Force did not publish the November 22, 2021 deadline in the Federal Register.

229.    The. U.S. Armed Forces are components of the federal Executive Branch.

230.    The U.S. Airforce and U.S. Space Force (active duty) have a vaccination deadline of November 2, 2021.

231.    Federal civilian employees laboring under Executive Order No. 14043 have a vaccination deadline of November 22, 2021.

232.    The U.S. Navy and U.S. Marine Corps (active duty) have a vaccination deadline of November 28, 2021.

233.    The U.S. Air Force Reserve and Air National Guard have a vaccination deadline of December 12, 2021.

234.    The U.S. Army (active duty) has a vaccination deadline of December 15, 2021.

235.    The U.S. Navy Reserve and U.S. Marine Corps Reserve have a vaccination deadline of December 28, 2021.

236.    Federal contractors laboring under Executive Order No. 144042 have a vaccination deadline of December 8, 2021, that was recently moved to January 4, 2022.

237.    Private sector employers with 100 or more employees laboring under the OSHA Emergency Temporary Standard have a vaccination deadline of January 4, 2022.

238. The U.S. Army Reserve and Army National Guard have a vaccination deadline of June 30, 2022.

239. Neither the President of the United States, the CDC, nor the Task Force have ever explained the divergent deadlines among the aforementioned components of the executive branch.

240. The Task Force's November 22, 2021, vaccination deadline for federal civilian employees is arbitrary and capricious.

241. Defendants' mandating use of an EUA-Product with significant adverse effects is arbitrary and capricious.

242. Disregarding natural immunity is arbitrary and capricious

243. The Task Force's stated purpose is to provide government-wide guidance on public health best practices.

244. The Task Force's membership, with the exception of the Director of the CDC, is comprised entirely of agency-heads with no medical education, training, or experience.

245. The Task Force has never publicly posted any findings of fact.

246. The Task Force has only publicly posted final decisions (read: rulemaking) on its website.

247. The Task Force refuses to acknowledge infection-and-recovery as providing lasting immunity to COVID-19.

248. Federal agencies are subverting informed consent and barreling toward firing employees who exercise their statutory right to refuse EUA-products

249. Under the EUA Informed Consent statute, individuals have the right to refuse compulsory administration of that product.

## COUNT 4: VIOLATIONS OF DUE PROCESS AND THE *APA*

250.    The *Administrative Procedures Act*, *5 U.S.C. §§ 500-706*, provides for judicial review to compel agency action if it is unreasonably delayed *(§ 706 (I))*, as well as judicial review for a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* at *§ 702*. "Agency action" includes the "failure to act." *Id.* at *§ 551(13)*.

251.    When unreasonable delay occurs, courts may "compel agency action unlawfully  withheld or unreasonably delayed," and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. at *§§ 706(1) - (2)(A)*.

252.    The *APA* also requires that agencies give "prompt notice" after denying a petition and, "[e]xcept in affirming a prior denial or when the denial is self-explanatory," give "a brief statement of the grounds for denial." *Id.* at *§ 555(e)*.

253.    Defendants have a duty to timely respond to Plaintiff's Petition. See *5 U.S.C. § 555(b)*.

254.    Defendant have mandated firm deadlines for Plaintiff to become "fully vaccinated."

255.    Despite this, Defendants have failed to provide information about the full extent of the availability of exemptions "by law." If the Defendants possesses legal guidance about any other such exemptions, they should be compelled to disclose that information. Withholding such information may facilitate Defendants' stated goal of foisting mRNA injections onto citizens, but it violates their due process and procedural rights by keeping them unnecessarily in the dark.

256.    Similarly, Defendant was slow to provide guidance as to how Plaintiff could submit an application for an exception or what the submission process would entail. Defendants provided Plaintiff with no notice that a new template was substituted for the religious exception form.

257.   Given the extremely limited timeframe by which Defendant demands Plaintiff receive an injection, the delay in promulgating an exemption policies and procedures extends far beyond the bounds of any ordinary or reasonable response time under the *APA*.

258.   Defendant's violation is ongoing and, as such, Plaintiff moves this Honorable Court to enter an Order declaring President Biden's Executive Order 14043 unconstitutional as violative of the Due Process clause of the Fifth Amendment of the United States Constitution, or, in the alternative, to enjoin its application until such time as Defendant has furnished information as to the full extent of available exceptions and the application process for which to apply for any available exceptions, and has processed all such exception applications to the stage of final agency decision.

**CLAIM 5:**
**INJUCTIVE RELIEF SOUGHT TO PREVENT HARM STEMMING FROM REFUSAL TO APPROVE LEAVE IN VIOLATION OF THE FIFTH AMENDMENT**

259.   Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

260.   Due process is the means by which the Government may lawfully deprive an individual of his or her life, liberty, or property. *U.S. Const. Amend. V*. Public employers – whether state or federal – are covered by the due process requirements of the U.S. Constitution. While the federal Government is covered by the Fifth Amendment and the states by the Fourteenth Amendment, the effect is the same. See *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) (explaining that, "when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause"); *Block v. Hirsh*, 256 U.S. 135, 159 (1921) (explaining that, "[t]he national government  by the Fifth Amendment to the Constitution, and the states by the Fourteenth Amendment, are forbidden to deprive any person of 'life, liberty, or property, without due process of law'").

261.    Plaintiff has a property interest in his employment with the federal government.

262.    Plaintiff has accrued roughly 600 hours of sick leave and roughly 200 hours of annual leave. Annual leave may be substituted for sick leave. Thus, Plaintiff has roughly 800 hours of leave which could be applied towards sick leave purposes.

263.    Under extant federal regulations, agencies must grant use of sick leave to those employees who cannot be present at work because of the risk of communicable disease. *5 CFR § 630.401*.

264.    Because he has not received an injection, Defendants deem Plaintiff a health risk on the theory that he might expose employees and the public to the communicable disease COVID-19.

265.    Defendants' refusal to allow Plaintiff to utilize the leave that he has earned and accrued is contrary to federal regulations and violates the Plaintiff's Due Process rights to which the Defendant has a duty to uphold under the 5th Amendment and therefore constitutes an unconstitutional taking.

266.    Defendants have no reason to prevent Plaintiff from accessing the leave that he has accumulated other than to leverage the threat of imminent job termination as a means to coerce him into receiving an unwanted medical treatment.

**CLAIM 6:**
**INJUCTIVE RELIEF SOUGHT TO PREVENT HARM STEMMING FROM FIFTH AMENDMENT AND NINTH AMENDMENT VIOLATIONS**

267.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

268.    The Supreme Court has recognized that the  Fifth and Ninth Amendments protect an individual's right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990). The common law baseline is the touchstone out of which grew corresponding

58

constitutional law. *See, e.g.*, *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'"). *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser And Keeton On Law Of Torts § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

269.     Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997). The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

270.     In *Mazares, Jr. v. Navy*, 302 F.3d 1382 (Fed. Cir. 2002), the captain of a Navy ship approaching hostile waters and facing enemy biological weapon production capabilities according to Department of Defense threat assessments, ordered civilian employees on the ship to take a vaccine that would guard against Anthrax bacteria. The captain terminated the employment of two civilian employees who refused to take the vaccine for insubordination, an action which was later upheld by the MSPB and the federal Circuit. c.f. *John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to *EUA* only "on a voluntary basis"). This case is distinguishable from the case at bar where

59

anthrax bacteria and its dangers, as opposed to SARS-CoV2, were well understood, the Anthrax vaccine, as opposed to the available COVID-19 injections, had been used by humans for decades, and mandated administration of the vaccine was narrowly tailored for military and national security purposes in stark contrast with President Biden's broadly writ and sweeping executive order. Additionally, military service members were afforded a medical exemption from the anthrax vaccine. *See, e.g.*, Coast Guard Anthrax Vaccine Immunization Program (Avip), Letter dated February 19, 2019.[95]

271.    Given that Plaintiff is not involved in national defense, not in hostile waters, and is not being afforded the option of a medical exemption, and given that these novel COVID-19 injections are not traditional vaccines with long lasting protection from COVID-19 or even demonstrably capable of mitigating transmission of COVID-19 once injected according to the CDC, the discussion provided by the court in *Mazares Jr. v. Navy* within the context of military defense provides little guidance to the case at bar.

272.    Even less instructive is *Jacobson v. Massachusetts*, 197 US 11 (1905). The *Jacobson* opinion dealt with smallpox – a disease that killed three out of ten of the people infected by the virus – and where the smallpox vaccine had been used in humans for more than ten years before it was mandated, and nearly one hundred years before the Supreme Court had ruled on the constitutionality of the mandate. In that case, the Supreme Court ruled that a mandate for a very effective and long-lasting *vaccine* promulgated by a state legislative body and narrowly deployed upon a local Cambridge, Massachusetts outbreak was constitutional. Such a ruling is of limited utility here considering that the case at bar involves a novel COVID-19 vaccine benefiting from

---

[95] https://media.defense.gov/2019/Feb/19/2002090711/-1/-1/0/CI_6230_3D.PDF ("by competent medical authority or administratively exempted by command authority.")

less than one year of human use mandated by a single person broadly across a vast population of geographically diffuse federal employees.

273.    Indeed, none of the "vaccine cases" upon which the Defendant will rely to argue that a rational basis review is appropriate to deal with such a novel, broadly contentious novel injection therapy. Even those who have taken the injections may have done so only because of the perceived threat to their access to participation in the job market, and many regret it now. Reliance upon traditional vaccine caselaw that dealt with narrowly tailored mandates of established therapies for determining the outcome of the dispute at bar would be inappropriate.

274.    When a state policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard applies – "a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

275.    Defendant cannot show that he has a compelling interest in coercing the Plaintiff into taking a COVID-19 "vaccine," because the President has no compelling interest in treating employees with natural immunity any differently from employees who obtained immunity from a vaccine. And regardless of natural immunity versus vaccine status, the CDC's own data suggests that there is little difference between vaccinated and unvaccinated persons with respect to the transmission of the current Delta variant of COVID-19.

276.    Whether strict scrutiny, heightened scrutiny, or rational basis review is used, the mandate fails because it carves out only vague exemptions established "by law," and none for those that may be necessitated "by reason." Caprice is baked directly into the Order where it provides only for vague "by law" exemptions. Thus, the Order is arbitrary, *per se.*

277.    An employee who is at high risk for suffering severe side effects from the injections and low risk of severe outcomes from the underlying virus has no recourse unless he can prove that his risk is associated with a disability; this is arbitrary and capricious.

278.    An employee whose identical twin has suffered a severe adverse reaction from novel mRNA injections will still be compelled to undergo an injection pursuant to the Defendant's vaccine mandate; this is arbitrary and capricious.

279.    An employee who has recently defeated a COVID-19 infection and who now possesses high levels of protective antibodies will be discharged, while an employee who underwent mRNA injections 9 months prior and now possesses few, if any, protective antibodies, remains employed; an arbitrary and absurd result.

280.    An employee who works exclusively via telework and has no physical interaction with coworkers or the public is required to receive an injection under the mandate's banner of providing a safer workplace and protecting the public; this is arbitrary and borderline absurd.

281.    The Order is arbitrary and not tailored to meet its stated objectives where the protective properties of the novel mRNA injections are temporary, as it is well-documented that they degrade significantly after six to eight months, yet the Order requires permanent job loss for refusal to undergo an injection. Clearly less restrictive means are available, such as telework, frequent virus and antibody testing, use of leave (paid or unpaid), and layoff.

282.    *If* the Order was ever a reasonable and constitutional use of power, the recent and unexpected rejection by the FDA of a third "booster shot" for the general population has rendered its continued enforcement arbitrary, again, in light of well-documented data establishing that the durability of one and two shot COVID-19 vaccine doses wanes after six months.

283. Further evidence that Defendant's vaccine mandate is arbitrary is demonstrated by the mandate's effective coopting of the regulatory process for creating medical standards. See *5 CFR § 339.202* and *5 CFR § 339.25*. See *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring)("It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.") Here, the Defendant – rather than directing his administration to implement novel "vaccine" requirements under extant regulations – unilaterally and summarily issued a blanket vaccine mandate himself and ordered his Safer Federal Workforce Task Force to implement a deadline for vaccination within 7 days (despite the fact that the country is already on the other side of the Delta spike). The arbitrary deadline requires federal employees to choose between keeping food on the table or undergoing an unwanted COVID-19 "vaccine" injection by October 11, 2021, while providing no deadline or guidance for the exception application and determination process utilized by federal agencies. Indeed, whim and caprice abound.

284. The Order is also arbitrary and unreasonable because the FDA approved brand-name version of the injection is not widely available -- a fact which creates a de facto requirement that employees take, under duress, Emergency Use Authorization injections in conflict with the *EUA* statute, *21 U.S.C. § 360bbb-3*, which explicitly states that anyone to whom an *EUA* product is administered must be informed of the option to accept or to refuse it, as well as alternatives to the product and the risks and benefits of receiving it.

285. Although the Fourteenth Amendment's Equal Protection clause is applicable to states and lacks a corollary in the text of the Fifth Amendment, it is well established that an equal protection right is found within the Fifth Amendment's "due process" clause when "discrimination

may be so unjustifiable as to be violative of due process." *Bolling et al. v. Sharpe et al*, 347 US 497, 497 (1954). The President's arbitrary and capricious treatment of unvaccinated Americans rises to the level of a discriminatory due process violation. The President himself pontificated only three months ago about the virtue of protecting those "populations sharing a particular characteristic, as well as geographic communities, who have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life," and yet, here, he is systematically denying exactly that to a population that objects to a new and controversial treatment.

286.    In this regard, federal employees and contractors are being treated more harshly than employees in the private sector, who are subject to Defendant's slightly less draconian OSHA mandate, which at least provides for an "frequent testing" option in lieu of mRNA injection.

287.    When reviewing Executive Orders for "rational basis," the courts may consider plaintiffs' extrinsic evidence, of unconstitutional motivation. *Trump v. Hawaii*, 585 U. S. ___, ___, 138 S.Ct. 2392, 2417, 201 L.Ed.2d 775 (2018). Accordingly, the Defendant's own public statements demonstrate that he is willing to draft legally questionable Executive Orders in order to secure "dubious wins" by exploiting the protracted timeframe inherent to most forms of litigation. President Biden is on the cusp of achieving a "dubious win" here by forcing federal employees to make the Hobson's choice between undergoing an unwanted mRNA injection and losing their livelihood derived from federal employment. Such a mandate functions only to increase the percentage of vaccinated federal employees while banishing from the federal workforce those who object to the Defendant's arbitrary and capricious mandates that infringe upon their constitutional freedoms.   The Defendant's arbitrary and capricious mandate simultaneously ensures that banished federal employees face hostile venues when seeking

64

administrative recourse that are staffed only by "the vaccinated." The President repeatedly flaunts his questionable motives when he and his administration: 1) frequently malign and belittle the reasonable concerns held by those who object to undergoing novel injections; 2) direct ire towards the unvaccinated, and; 3) threaten to "run over" elected representatives who oppose federal injection mandates. Defendant's animus towards those who decline the injections, along with his clear intent to use the blunt force of executive orders to achieve his will, coupled with the lack of reasonableness attached with such a broad and sweeping Order, clearly demonstrates that Defendant's Order violates the due process clause of the Fifth Amendment.

288.    Accordingly, Plaintiff moves this Honorable Court to enter an Order declaring President Biden's Executive Order 14043 unconstitutional as violative of the constitutional protections afforded the Plaintiff via the Fifth Amendment and Ninth Amendment of the United States Constitution.

Respectfully submitted this 12th day of November, 2021,

By:

-------------------------------------
David A. Foley
Texas Bar No. 24122807
David.Foley.JMJ@proton.com
(682)325-8378
1542 Wayside Dr.
Keller, Texas

By:

-------------------------------------
Daniel S. Flickinger
Alabama State Bar No. 9539N77F
dflick@gmail.com
205-470-6997
P.O. Box 36956

Hoover, AL 35236
*Pro hac vice application forthcoming*